**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **FRANK L. TOOLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.: 1:13-cv-145-KD-B** |
| | ) | |
| **METAL SERVICES, LLC d/b/a** | ) | |
| **PHOENIX SERVICES LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO
THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Temple D. Trueblood
Wiggins, Childs, Quinn & Pantazis, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

Henry Brewster, Esq.
205 North Conception Street
Mobile, Alabama 36603
(251) 338-0630

Edward L.D. Smith
Post Office Box 1643
Mobile, Alabama 36633-1643
(251) 432-0447

> "it just seemed rather silly to have someone go through a DOT physical that was not going to be required to drive." –Dana Faircloth, Assistant Manager of Logistics and Staffing, explaining why the company dropped their requirement that non-drivers like Plaintiff take DOT physical exams

## I.   NON-MOVANT'S ADDITIONAL AND/OR DISPUTED FACTS

### A.   Frank Toole's Qualifications and Employment History

Frank Toole ("Toole") has extensive experience in maintaining both employee and workplace safety in heavy industrial environments. (Toole Ex. 12, p. 2). He possesses OSHA training and certification in OSHA 500 (Train the Trainer) and OSHA 510 (30 Hour Safety Training) from the University of Alabama, and a Transportation Workers Identification Card. (Toole 60, 64-65; Toole Ex. 9, p. 1). He was also certified and/or trained in Confined Space Entry, Insulation and Stainless Steel Jacket Pipefitting, Basic Electrical & Construction Supervision, Level II License in Waste Water Management for the State of Alabama, Concrete Technology from the American Concrete Institute, and Asphalt Testing for the State of Alabama. (Toole Ex. 9, p. 1). He is experienced in operating various heavy equipment including boomlift/AWP, forklifts/50k, lulls, bobcats and backhoes. (Toole Ex. 9 p. 1; Toole Ex. 12, p. 2). Toole possesses an Alabama State Drivers License with no restrictions. (Toole Ex. 22, p. 1). He drives a Ford F-150 pick up truck as a personal vehicle. (Toole 106).

Prior to, at the time of, and subsequent to his March 2011 application for a safety job with the Defendant, ThyssenKrupp Inplant Services, LLC ("TKIPS"), Toole was employed in safety positions for various contractors at the ThyssenKrupp ("TK") worksite in Calvert, Alabama. Toole

worked for Chastain Construction as Safety at the TK steel plant in Calvert, Alabama. (Toole 80-81). His duties included observing and monitoring employees at the TK site to ensure compliance with safety rules and regulations and maintaining a safe work environment. (Toole Ex. 9, p. 1). In May/June 2010 Toole worked for HMIS Contracting as Safety at the TK steel plant in Calvert, Alabama. (Toole 76-80). His duties included ensuring compliance with safe work practices for over 500 employees in the TK stainless steel shop/mill, administering first aid, transporting workers for medical treatment, and training personnel in safety per industry standards and practices. (Toole Ex. 9, p. 1). Toole was laid off in November 2010. (Toole 80). In November 2010 Toole worked for 3-D Metal Works as Safety at the TK steel plant in Calvert, Alabama. (Toole 72, 73, 76-77). His duties included monitoring 50-60 employees in the TK steel mill maintenance shop to ensure compliance with safety policies and procedures, and training personnel per industry standards and practices. (Toole Ex. 9, p. 1). Toole was laid of in September 2011 as a result of reduction in force. (Toole 73). In October 2011 Toole worked for SIMMCO Construction as Night Safety on the TK steel site in Calvert, Alabama. (Toole 66-67, 69, 76-77). His duties included monitoring 45 employees in the TK steel mill stainless metal shop to ensure compliance with safety policies and procedures, conducting weekly safety meetings, administering first aid to employees, maintaining employee time cards/absences, and making sure the company was OSHA compliant with 70% of his duties performed in the field. (Toole 71; Toole Ex. 9, p. 1). He was laid of in June 2012 due to lack of work. (Toole 66-67). Toole was also employed by AHR as a Safety Specialist on the TK work site in Calvert, Alabama. (Toole 46-47, 59-60, 76-77). His duties included correcting OSHA violations and deficiencies with 70% of his time spent in the field. (Toole 60). Toole was laid off from AHR on November 29, 2012, due to lack of work. (Toole 57). On February 11, 2012, Toole became

2

employed with Tube City working on the TK work site in Calvert, Alabama. (Toole 26-28, 45, 76-77). When he was initially hired by Tube City they denied him employment because of his monocular vision, but after Toole filed a Charge of Discrimination with the E.E.O.C. and mediating the matter, Tube City retained his employment as dock leader and truck operator where he drives a 772 Cat dump truck on the TK worksite. (Toole 26-31, 51-54, 106).

### B.    General Background Information of TKIPS' Operations

Art Hamilton[1] began work for TKIPS at the TK Calvert, Alabama, site on February 15, 2011, as Site Manager over transportation/logistics. (Hamilton 19, 23-24, 39). At this time TKIPS did not send large trucks out on the road–all truck movement was inner plant.[2] (Hamilton 30). In early 2012 Hamilton became General Manager of the site and in May 2013 he was promoted to Director of Operations for the Southern Region. (Hamilton 39-40).

Dana Faircloth was employed as Branch Manager of Hoffman Services in 2010 until May 2011, supplying workers to TKIPS at the TK Calvert site. (Faircloth 9-11, 38-39). She was involved in the TKIPS contract beginning in June 2010 and then became employed by TKIPS on June 1, 2011[3], as Assistant Manager of Logistics and Staffing reporting to Hamilton. (Faircloth 11-14, 42-

---

[1] Hamilton was designated by TKIPS as its F.R.C.P. 30(b)(6) deponent in response to Plaintiff's Rule 30(b)(6) Deposition Notice and the topics contained therein. (Hamilton Ex. 23; Hamilton 7).

[2] TKIPS did not start hauling steel offsite until some undetermined time in late 2011/2012. (Hamilton 33-34, 42).

[3] The majority of Hoffman employees became TKIPS employees. (Faircloth 18). The Hoffman drivers at TKIPS did not have to complete the DOT physical because all of the driving and hauling was done on-site. (Faircloth 101, 105-107).

44). Faircloth did not have a job description with TKIPS[4], but her main duties were hiring for TKIPS and she received and reviewed applications, performed interviews, and sent applicants to drug/alcohol and physical testing. (Faircloth 14-15, 42-46).

Prior to August 2011, all new employees were sent for a DOT physical; thereafter drivers were sent for a DOT physical and packers were sent for a non-DOT physical. (Faircloth 18, 21, 25-26). This change took place because, "it just seemed rather silly to have someone go through a DOT physical that was not going to be required to drive." (Faircloth 21).  Faircloth questioned Hamilton about this practice when she was hired by TKIPS in June 2011. (Faircloth 22-24). Hamilton told Faircloth to "fix it," to have the appropriate physicals performed in a more job-associated way and Faircloth did so, sending the  Industrial Medical Clinic ("IMC") job descriptions so that IMC would have an idea of what duties were actually involved in a position in order for them to best evaluate the employee. (Faircloth 25, 29).

In February 2011, TKIPS only had one person working in Safety[5] at the TK Calvert site: Preston Howard, Safety Specialist, who investigated and filled out accident reports, monitored safety at various areas on site and did no training. (Hamilton 64-66).  Howard did not drive at the plant and did not hold a CDL as Safety Specialist. (Hamilton 133).  At this time, TKIPS was having ongoing,

---

[4] Per Faircloth up until August 2011 she can only recall job descriptions in existence for the following positions: driver, packer, mechanic, shift leader, controller, human resource/office manager, and accounts payable. (Faircloth 31-34).  After TKIPS was bought out by Phoenix, in January 2012 Hamilton and Faircloth began reviewing job descriptions and revising them. (Faircloth 34-35).

[5] In the Fall of 2010, TKIPS management were in discussions about providing safety personnel at the TK Calvert, Alabama, site. (Hamilton 234-239; Hamilton Ex. 34 and 35). In an e-mail dated November 25, 2010, in which the creation of a new Safety Specialist position was discussed, HR Director Eric Badya questioned the need for DOT certification, stating "our operations don't fall under DOT regulation." (Hamilton Ex. 34, p. 1-2).

daily problems with equipment damage and had received a notice of breach of contract from TK. (Hamilton 55-56, 93-94). Hamilton began working on a strategic plan[6] to address the problems in multiple areas of Operation, Safety and Performance. (Hamilton 91-92).

### C.   Toole Applies for a Safety Job Position with TKIPS in March 2011

Hamilton saw Toole on the TK Calvert site from time to time while Toole worked for other companies and at some point in March 2011 Toole and Hamilton spoke a couple of times about Toole's interest in a Safety position with TKIPS and discussed Toole's job experience.[7] (Hamilton 54-55, 61-62). In the first conversation, Toole told Hamilton that his current job was going to end, that he had heard that a Safety position was open, and told Hamilton of his job experience. (Hamilton 102-104). Toole told Hamilton of his OSHA certifications and Hamilton asked him about his experience filling out accident investigations and root cause analysis and "just the basics across the safety." (Hamilton 105). At this time, Hamilton was not sure what direction he was going to go in for the safety job. (Hamilton 104-105). Hamilton told Toole that he needed an enforcer to enforce safety, training, pre truck inspections, monitoring the drivers and teaching and training the drivers[8].

---

[6] If any written records of this plan existed they were likely destroyed by the defendant when TKIPS became Phoenix in January 2012, as "they purged a lot of the files and a lot of the things went away when TKIPS went away," and "they didn't leave us much of anything pertaining to documents because it was TKIPS." (Hamilton 97-99). Any records on his company computer from that time period would have also been cleaned out. (Hamilton 100-101).

[7] Hamilton provided a prior contrary sworn Declaration to the E.E.O.C. in which he averred these conversations did not occur: "I have not, however, had any conversations with Mr. Toole about his application for employment with ThyssenKrupp nor his physical." (Ex. I).

[8] Hamilton admitted that he did not discuss these needs with Toole verbatim. (Hamilton 106-107). Per Toole, he was told that he would be training drivers only to the extent that he would make sure that they did their pre-op and safety checks correctly. (Toole 244, 251-252). He was never told that enforcing DOT regulations would be part of his duties. (Toole 260-261).

(Hamilton 56, 105-106). Hamilton told Toole that he wasn't sure what he was going to do yet and it would probably be a few weeks as Hamilton had not made a final decision. (Hamilton 111-112).

On March 18, 2011, Toole applied with TKIPS for a Safety position setting forth his experience and safety certifications. (Toole 133-134, 139; Toole Ex. 12). Thereafter, Toole met with Eric Badya, Director of Human Resources. (Toole 141-143). While Toole was speaking with Badya, Hamilton walked up and Badya told Hamilton he should hire Toole. (Toole 143).  Toole then gave Hamilton a copy of his resume which Hamilton reviewed[9]. (Toole 143; Hamilton 112-114). At this time, Hamilton still had not made a decision on filling the job and "didn't make any commitments to Frank [Toole]." (Hamilton 114).

Within thirty minutes of this second meeting, Hamilton called Toole back for an interview with himself, Preston Howard and Christian Koesling[10]. (Toole 143). At this time Hamilton told Toole that Preston Howard would be his boss, his rate of pay and that he was hired, pending a physical. (Toole 140-141, 143-144). Hamilton told Toole that he wanted Toole to be his enforcer because they were having too many safety accidents which he wanted corrected and that his job would be to make sure the drivers filled out and did pre-inspection reports on the trucks, generally enforce safety rules, make sure the drivers followed all OSHA rules and regulations, and that no CDL was required. (Toole 144, 238-240, 251).  Toole already had experience in all of these areas. (Toole 239). No other job duties were discussed, Hamilton did not have a detailed description or title

---

[9] Toole's resume did not reflect that he possessed a CDL, that he had CDL training experience, or that he had any experience in the enforcement of DOT regulations/rules. (Toole 260-261).

[10] It is noted that Hamilton has given sworn testimony that no such interview or meeting ever took place. (Hamilton 120-122; Ex. I). He instead speculated at his deposition that a job offer may have been extended to Toole by Stovall. (Hamilton 118-119).

for the safety job[11], and Toole was never shown or provided with a job description. (Toole 144-145, 185, 237-238). During the meeting no one mentioned that Toole would be driving a 15 passenger van, transporting people, operating equipment, or driving on public roads and Toole's understanding from the interview was that all of his duties would be performed on site. (Toole 243-244).

Per TKIPS' October 24, 2011, response to Toole's E.E.O.C. Charge of Discrimination, Toole was only "considered" for the safety position and TKIPS "did not hire Charging Party for the position." (Faircloth Ex. 14, p. 1-2).  TKIPS further stated to the E.E.O.C. that the DOT Medical exam was "part of the application process," and that when Toole allegedly "refused to complete the process that would let the Respondent know if he was certified to safely drive, Respondent ceased considering Charging Party for that position." (Id. at 2). Per Hamilton's November 2, 2012, Declaration he did not interview Toole and had no conversations with Toole about his application for employment or about taking a DOT physical to become employed. (Ex. I).

However, at deposition, Hamilton testified that he had decided to hire Toole based on Toole's experience in the mill, understanding of the environment and his prior experience in safety. (Hamilton 115-116). Hamilton felt hiring Toole was an advantage because Toole was already experienced at the job site in a safety capacity and he envisioned how he could use Toole considering Toole's experience and Hamilton's needs. (Hamilton 57-58). Per Hamilton, Toole possessed the necessary skill sets to bring him in. (Hamilton 165-166). Per Toole's conversations with Hamilton he would not be driving as part of his job duties and Hamilton, admittedly, did not share any thoughts about obtaining a CDL, training on trucks, or the need for a DOT physical with Toole at

---

[11] No job description for this position existed at that time. (Hamilton 68-70). At that time the position was just based on Hamilton's "vision" which was evolving and changing as TKIPS was still establishing procedures and things were moving rather quickly. (Hamilton 70, 74-75).

the time. (Toole 56; Hamilton 116-119). At the time Toole was hired he was not required to have a CDL.[12] (Hamilton 60, 118).

Per Hamilton's deposition testimony, Toole's position was to be that of a Safety Trainer. (Hamilton 67-68). Yet, Hamilton has admittedly never used this job description in evaluating a person for a safety position at TKIPS. (Hamilton 73; Faircloth Ex. 15). The Safety Technician/Safety Trainer job description did not exist at the time Toole was going through the hiring process. (Faircloth 100). As late as October 2013 Hamilton was unsure if he had ever seen the job description for the Safety Technician/Safety Trainer position and has no idea of how or when it came into existence. (Hamilton 70-71; Faircloth Ex. 15). However, Hamilton had seen the job description for the Safety Specialist position which does not require a CDL or operation of heavy equipment. (Hamilton 71; Faircloth Ex. 22).

**D.    Toole is Subjected to a DOT Medical Examination**

Toole filled out and turned in new hire paperwork on March 24, 2011, and was then told to go to IMC for a physical exam. (Toole 145-149, 150). Per the TKIPS Pre-Employment Physical form, TKIPS requested that IMC administer to Toole a 10 Panel Rapid drug screen, a Breath Alcohol Screen, a DOT Drug Screen, and a DOT Physical. (McDowell PX 1; McDowell 30). Yet, under the section for Job Position designations on the form neither the "Shift Leader of Construction Vehicle Driver," nor the "Construction Vehicle Driver," designations were selected. (McDowell PX 1).

---

[12] It is noted that Hamilton has provided a contradictory sworn statement in response to Plaintiff's Interrogatories in which he stated, "a commercial driver's license was required," for the position. (Ex. H, p. 15-16--Responses to Interrogatories No. 6 and 9).

Toole met with Dr. McDowell at IMC and was given a DOT medical exam[13]. (Toole 160). On the IMC History and Review of Symptoms form, Toole disclosed his high blood pressure and removal of left eye[14], as well as his blood pressure medication. (Toole Ex. 22, p. 2).  Toole did not disclose having a sleep disorder as, at that time, he had not yet been diagnosed with same.[15] (Toole 155-156, 226; Toole Ex. 11).

During the exam Toole was given an eye test and his monocular vision was noted on the Medical Exam Report. (Toole 161-166; Toole Ex. 25, p. 2). Dr. McDowell told Toole that he would need a waiver to obtain a DOT card.[16] (McDowell 50-51). Toole also had his blood pressure taken

---

[13] At the time of the exam Dr. McDowell was not made aware by TKIPS for which position Toole was hired or what job duties Toole would be performing. (McDowell 53).

[14] In April 2008 Toole had his left eye removed as a result of being diagnosed with a cancerous tumor and now uses a glass eye. (Toole 94-95).

[15] As of Toole's March 22, 2011, visit to Dr. Ledet, the physician's assessment was only, "severe snoring, pathological daytime somnolence, ***rule out sleep apena/narcolepsy***." (Toole Ex. 22)(emphasis added). A diagnosis for a sleep disorder (sleep apnea) was not made until after the completion of a sleep clinic on March 30, 2012. (Toole 231-232, 245).  Toole was then prescribed a treatment/sleep apnea machine and has suffered no symptoms since that time. (Toole 232). In addition, the treatment also resulted in a lowering of his blood pressure and related symptoms. (Toole 232-233). Dr. McDowell testified that based upon the March 22, 2012, notes of Dr. Ledet he would not have expected Toole to have disclosed a sleep disorder and that he could not say that he would have failed Toole on his physical as he would have required testing to determine if he had sleep apnea. (McDowell 109-111, 122-124). Per Dr. McDowell, Toole's ultimate resolution of the matter would have alleviated his concerns with Toole being medically fit to obtain a DOT certification. (McDowell 145-146).

[16]Toole immediately looked into obtaining a waiver from the DOT. (Toole 173). Toole was informed that if you did not already hold a CDL then you could not get a waiver for monocular vision. (Toole 56; Toole Ex. 28). As Toole did not hold a CDL, the waiver was not attainable. (Id.).

which measured 160/102[17]; he was told that it was high and that he needed to see a doctor to get it down. (Toole 118, 167-168; Toole Ex. 27). Toole said that he would do so. (Toole 168). Toole's blood pressure results were not recorded on the Medical Exam Report. (Toole Ex. 25, p. 2). If a patient has high blood pressure, IMC typically lets them lie down and rest for a retest or places them on hold, directs them to see their physician and return once their blood pressure is under control. (McDowell 46-47). However, McDowell cannot recall what options/ instructions were actually given to Toole about his blood pressure on that date. (McDowell 47). Toole did not refuse to do any portion of the exam/testing. (McDowell 66-67).

Dr. McDowell did not complete the medical exam and told Toole that he could not do so until Toole obtained a waiver from the DOT for his vision. (Toole 169; Toole Ex. 25). Dr. McDowell placed Toole's physical on hold due to "BP" of 160/102 and, "Monocular vision–will need a waiver." (McDowell 59-60, 132; Toole Ex. 27). Typical practice in 2011 was for IMC to e-mail the physical results to TKIPS; the copy of the IMC Medical Examination Report provided to the E.E.O.C. by TKIPS is stamped, "RECEIVED MAR 30 2011." (Faircloth 89-90; Faircloth Ex. 14, p. 9-12).

Under a standard non-DOT physical exam Toole's monocular vision wold not have resulted in a hold being placed on the test. (McDowell 83-84). At the time of Toole's physical exam, IMC was performing DOT physicals on all of the employees sent to them at TKIPS' request. (McDowell 54). Per Dr. McDowell, the DOT test is "restrictive in specific ways that may or may not apply to general employment," and is not pertinent to many jobs or every employment situation. (McDowell

---

[17] Per the DOT Medical Examination Report, such a blood pressure reading in the range of 160-179/100-109 qualifies the patient for a one time certificate for three months which is eligible for recertification if blood pressure is lowered. (Toole Ex. 25, p. 2; McDowell 78-79).

27-28, 59). For example, a person with insulin dependency or monocular vision cannot pass the DOT test. (McDowell 28). Because of this, Dr. McDowell spoke with the Director of the IMC about the potential A.D.A. issues that could arise from use of the DOT exam as a standard for general employment and about the need to discuss this issue with TKIPS. (McDowell 27-28, 95-97). After this conversation, TKIPS changed its practice, directing IMC to test applicants by using one of two classes of physicals–a DOT physical and a standard physical. (McDowell 76-78, 91-92, 96).

      **E.**    **TKIPS Denies Toole's Request for a Reasonable Accommodation**

After undergoing the DOT physical, Toole spoke with Kameka Stovall of TKIPS, questioning why he needed a CDL when his job did not entail driving and Hamilton had told him a CDL was not required. (Toole 182-183, 241-243, 254). Stovall told him to talk to Hamilton. (Toole 183). Toole came to the TKIPS office many times insisting that he did not need to complete the DOT physical because the job did not require driving. (Faircloth 99). During this time, Toole also spoke with Hamilton 2-3 times about the status of the job. Hamilton initially told Toole that he was waiting on the medical exam results. (Toole 176-177, 234). The IMC Medical Examination Report provided to the E.E.O.C. by TKIPS is stamped as, "RECEIVED MAR 30 2011." (Faircloth 89-90; Faircloth Ex. 14, p. 9-12). Toole contacted Hamilton again and asked him whether he could provide Toole with a waiver or if he could otherwise be hired without the waiver. (Toole 175, 183). Hamilton denied the request, informing Toole that while he did not need a CDL, Hamilton could not hire him because Toole had not passed the vision part of the physical. (Toole 175-177, 234-236, 243, 254).

Hamilton testified that after a few days he learned that Toole's physical was not completed and that there was some problem with Toole's blood pressure. (Hamilton 59-60, 139-141). Toole testified that Hamilton never told him that he could not be hired because of his blood pressure.

11

(Toole 192). Nor did the IMC Medical Report Form received by TKIPS on March 30, 2011, indicate

any blood pressure reading or disqualification related thereto. (Faircloth Ex. 14, p. 9-12).

    **F.**    **TKIPS' Conflicting Accounts of what Actually Happened With the Safety Position Sought by Toole.**

        *1.*    *TKIPS' Version of Events in October 2011 and November 2012*

Toole filed a Charge of Discrimination with the E.E.O.C. against TKIPS on September 7,

2011, asserting claims of disability discrimination for his non-hire into the safety position.[18] (Ex. G).

Faircloth was involved in preparing TKIPS' responses to the Charge which were then submitted by

counsel. (Faircloth 53-54, 86-87, 113-114). TKIPS sent two submission to the E.E.O.C.–one in

October 2011 and one in November 2012.  (Faircloth Ex. 14 and 16). Faircloth, Hamilton, Espey,

searched for and provided the documents and information needed for the responses and the

information in each response was correct and accurate. (Faircloth 60-61, 68, 79-80, 86-87). Faircloth

confirmed that she gathered all responsive documents, sent them all to the E.E.O.C. and, thus,

provided "everything we had at the time." (Faircloth 54-55).  The only items not sent to the E.E.O.C.

were some new hire paperwork forms of Toole that TKIPS only recently found. (Faircloth 56-57).

The E.E.O.C. requested TKIPS to, "describe in detail the method(s) used by your

organization to receive, screen, and process applicants for employment for the position in question,"

and TKIPS responded, "To date [October 24, 2011], Respondent has not actively recruited for the

Safety Technician/Safety Trainer position." (Faircloth Ex. 14, p. 4). The E.E.O.C. also requested

TKIPS to, "state whether the position in question was filled during the relevant period. If your

answer is yes, provide the following for each person selected for the position:" with a list requesting

_____

    [18] The E.E.O.C. issued a Letter of Determination on November 13, 2012, finding in
Tooles' favor that there was, "reason to believe that violations have occurred." (Ex. E, p. 2).

the name, date of application, copy of application, job title, wage level and date of hire for each person identified. (Faircloth Ex. 14, p. 6 ¶5).  In its October 24, 2011, response TKIPS stated, "Respondent did not fill the position in question during the relevant period," and no additional information, names, application dates, hire dates, *etc.*, were provided. (Id.).  Per Faircloth, "this was the only answer we knew at the time. This is all I knew at the time;" "this was the only answer that we had at that particular time." (Faircloth 63-64). As of October 24, 2011, no one had been hired for the position which had been sought by Toole. (Faircloth 65).  In addition, the E.E.O.C. requested TKIPS, "state each and every reason why you contend the person(s) selected for the position was/were selected instead of the charging party," and TKIPS responded, "Not applicable," referring to its averment that the position had never been filled. (Faircloth Ex. 14, p.6-7).

TKIPS also asserted to the E.E.O.C. that the duties for the position sought by Toole that may actually "require driving" were: "(1) performing DOT driver safety training for respondent's drivers, (2) driving to all areas of operation at the worksite to perform safety inspections, and (3) driving a 15-passenger van to transport employees for post-accident, near miss and minor personal injury medical treatment and substance abuse testing." (Faircloth Ex. 14, p. 2). No other duties were listed, no CDL-driving related duties were listed, and the extensive list of duties of the Safety Trainer position now set out by TKIPS and Roberts at summary judgment were not listed.[19] (Id.; DX 8, ¶4). To the E.E.O.C.'s production request for, "all written rules, policies and procedures relating to the issue(s) raised in the charge," TKIPS provided only its position statement; Toole's DOT Medical Examination Report from IMC stamped received by TKIPS on March 30, 2011; and Toole's Pre-

---

[19] Admittedly, when Hamilton hired Toole he did not anticipate that Toole could have done all of the duties as later performed by Roberts in the Safety Trainer position. (Hamilton 214).

Employment Physical Notification and Authorization. (Faircloth Ex. 14, p. 2, 8-14; Toole Ex. 25, 26 and 27).

In responding to the E.E.O.C. Faircloth was aware that Toole claimed he was hired for a job that did not require driving, thus a DOT physical was not necessary. (Faircloth 80-81). Although Faircloth believed TKIPS could have rebutted this claim with the Safety Technician/Safety Trainer job description[20] TKIPS inexplicable failed to provide it to the E.E.O.C. (Faircloth 81-84). Faircloth admitted that this may be because she had not even seen the job description until after November 2011 and, in fact, has no recollection as to when she first saw it. (Faircloth 81-86).

TKIPS sent a second submission to the E.E.O.C. on November 2, 2012, which it considered comprehensive and based on the information they had at that time. (Faircloth 86-87). Yet, again TKIPS failed to provide the E.E.O.C. with the Safety Technician/Safety Trainer job description. (Faircloth Ex. 16; Faircloth 87). In October 2011 TKIPS promised the E.E.O.C. that, "[s]hould Respondent locate any additional, relevant information, it will supplement its position statement and responses." (Faircloth Ex. 14, p. 1). Yet, in TKIPS's November 2012 correspondence it did not vary its prior position that the safety position had never been filled; did not supplement the three alleged non-commercial driving duties of the position; nor did it provide a copy of the alleged job description for the position requiring a CDL. (Faircloth Ex. 16).

### 2.   *TKIPS' Current Version of Events*

Per Hamilton, a couple of weeks had gone by after he spoke with Toole when Hamilton

---

[20] The draft Safety Technician/Safety Trainer job description was created by Buddy Espey. (Faircloth 74-75; Faircloth Ex. 15). Buddy Espey became the Safety Specialist in August 2011, following Preston Howard's resignation. (Faircloth 162, 164-165; DX 10). Faircloth first saw it when responding to the E.E.O.C., but it was not produced to the E.E.O.C. as relevant to Toole's Charge. (Faircloth 75-76, 78; Faircloth Ex. 14).

transferred Clyde Roberts[21] to the safety position. (Hamilton 60).  Per TKIPS Roberts filled the position sought by Toole and became Safety Technician/Safety Trainer in the transportation department from April 17, 2011 through January 2012. (Roberts 19-20, 22, 24, 49, 164; Hamilton 128). Roberts, however, is not aware of ever having held the job of "Safety Technician/Safety Trainer."[22] (Roberts 134-135).

Per Roberts, he was assigned the job of Safety Equipment Trainer by Hamilton and Joel Kendrick, Transportation Manager. (Roberts 34-35, 40-41). Roberts was told his duties would be to train employees on the equipment[23] and that he would report directly to Hamilton and Kendrick. (Roberts 39, 42, 44). Roberts was told nothing else about the job and was not provided a job description. (Roberts 44-45).  Roberts does not know if a CDL was required for this job and he has never been told by anyone at TKIPS at any time that a CDL was required for any of his positions. (Roberts 74-75, 83).

While there should be a personnel form completed at TKIPS to reflect the transition of Roberts from shift leader to Safety Equipment Trainer; there is none. (Faircloth 133-134). No such documentation reflecting Roberts' change in position exists. (Hamilton 168-169). However, there

---

[21]Clyde Roberts was hired by TKIPS on August 18, 2010, as a heavy equipment operator and at that time signed a job description for the position in which a CDL was not required, but was considered, "a plus." (Roberts 7-9, 12-18; Hamilton Ex. 24).  Roberts was promoted to Shift Leader Construction Equipment Operator on October 4, 2010, and again signed a job description at that time in which a CDL was not required, but was considered, "a plus." (Hamilton Ex. 25, p. 2).

[22] The Safety Specialist job description is partially accurate as to Roberts' duties except for his training duties. (Roberts 130-133). The Safety Technician/Safety Trainer job description is partially accurate as to Roberts' duties except for the OSHA 300 log . (Roberts 133-134).

[23] Prior to Roberts' alleged 2011 move to the safety position, TKIPS drivers were trained by shift supervisors–the position previously held by Roberts. (Hamilton 162-163).

are TKIPS Personnel Action Forms showing that effective April 1, 2011, Roberts was placed into the Turn Supervisor position as a salaried employee. (Faircloth Ex. 17; Hamilton 175-180; Hamilton Ex. 26 and 27). These documents do not reflect a change in Roberts' status to a safety training position. (Hamilton Ex. 27; Hamilton 180-181). There are no documents reflecting that Roberts held any safety position at any time prior to May 24, 2012, when the position of "Training Supervisor/Safety[24]" is first noted. (Hamilton Ex. 28; Hamilton 181-183).

While serving as Safety Equipment Trainer from April 2011 through January 2012, Roberts also filled in on equipment operator jobs running forklifts, stackers and trucks. (Roberts 51-53, 105-107). He did about 70-75% training and the rest was equipment operator work. (Roberts 54-55). From October 2011- January 2012, Roberts also worked as Rail Supervisor, loading rail barges, and his hours worked in the Safety Equipment Trainer position lessened to about 10% of his overall work. (Roberts 45-47).

As Safety Equipment Trainer, Roberts set up a course on site, did pretrip inspections, showed the drivers what he needed them to do and then tested their ability and provide training in areas in which it was needed. (Roberts 55-56, 153-154). The transportation department employees Roberts trained did not all possess CDLs; nor did they need a CDL as they were not going to be operating equipment on public roads. (Roberts 60, 63-64, 176-177). Until sometime in mid-2011, TKIPS' employees were solely in-plant employees and did not go "out of the gate" onto public roads. (Roberts 70-72, 84). Roberts' duties did not require and he did not actually start doing outbound training trips with employees on public roads until late 2012/early 2013. (Roberts 84, 86; Hamilton

---

[24] In January 2012 Roberts was promoted to Supervisor of Safety/Training in the safety department. (Roberts 24-25, 50).

211-212). As of February 2014 at least 18 TKIPS drivers have only a standard license. (DX 8, ¶6).

From April 2011 through October 2013 Roberts transported a maximum of three (3) employees in a 15 passenger van 1-5 times. (Roberts 136-138). TKIPS stopped using the van after approximately three months and from then on used non-commercial pick up trucks to transport employees. (Roberts 148-149, 171).

Roberts kept a log both as Turn Supervisor and in his Safety position. (Hamilton 200-203). At summary judgment, Roberts states that he was required to drive "commercial vehicles **and/or** non-commercial vehicles on site **and/or** off-site" 456 days out of 616 days worked. (DX 8, ¶4)(emphasis added). Roberts does not, however, discern in any way how many of those days were actually spent driving commercial vehicles off-site where a CDL would be required. (Id.). In fact, based on Roberts' approved accounting of his work in the spreadsheet created based upon his logs, there are only fifteen (15) specifically noted instances of Roberts driving a commercial vehicle off site from April 2011 through January 7, 2014. (DX 8, Ex.C, p. 2). These entries do not reflect if Roberts was performing these duties as part of his Safety position, as part of his Turn Supervisor position, or as part of incidental assignments given to him when his Safety training was slow. (Id.). Several of these fifteen entries took place during the October 2011- January 2012 time period when Roberts also worked as Rail Supervisor, when his hours worked in the Safety Equipment Trainer position lessened to about 10% of his overall work. (Id.; and Roberts 45-47).

Driving of heavy equipment off site is not included as one of the specific duties for the Safety Technician/Safety Trainer position. (Faircloth Ex. 15; Hamilton 315-321). Per Hamilton, such off site driving performed by Roberts was an "incidental duty assignment." (Hamilton 319-320). Such duties were usually performed by Shift Leaders and Construction Equipment Operators–Roberts'

prior positions. (Hamilton 321-323). The majority of the driving entries logged by Roberts were not within the enumerated duties set out in the written Safety Technician/Safety Trainer job description. (Faircloth Ex. 15; Hamilton 323-348; Hamilton Ex. 33) Yet, Hamilton weakly maintained that driving was covered; it simply fell under the catch-all "note" of additional incidental duties assigned. (Id.). Clearly, the driving performed by Robert was not a substantive duty of his written job description.  (Faircloth Ex. 15; Hamilton 319-320).

Dr. McDowell performed a DOT physical on Clyde Roberts on May 9, 2012. (McDowell DX 3, p. 1; McDowell 128-129). Roberts disclosed a history of seizures, epilepsy, high blood pressure and diabetes. (Id.). Dr. McDowell issued him a DOT certification for only one year with monitoring due to his high blood pressure and diabetes. (McDowell 129-131; McDowell DX 3, p. 3). From May 9, 2013, through May 26, 2013, Roberts did not possess a valid DOT medical certificate. (Roberts 88-92). Roberts is also not sure whether or not he possessed a valid DOT medical certificate from August 16, 2011, through May 9, 2012. (Roberts 93-96).  Yet Hamilton contends that if Roberts had not passed his yearly DOT physical, Hamilton would not have terminated Roberts but would have instead reviewed the IMC documents determined if the reasons that disqualified Roberts on the DOT physical were something that would have prohibited Roberts from actually doing his job. (Hamilton 191-194).  In fact, Hamilton would have cautiously discussed this with human resource administrators because to him, "that would be walking a tight rope with ADA if it wasn't properly handled. Just to terminate the subject because he had a medical issue." (Hamilton 194).

### 3. *Inconsistent Requirements for Safety Technician/Safety Trainers*

The TKIPS job description for Safety Technician/Safety Trainer states, "[a]ll teammates (regardless of position)" are "required to submit to and successfully pass a DOT Physical. (Faircloth

Ex. 15, p. 1). However, on August 26, 2011, TKIPS hired Matt McDaniel as a Safety Technician[25]

in the Safety Department but did not require him to undergo a DOT physical exam. (DX 7, ¶7; Ex.

N). McDaniel's hiring letter stated that he is only required to possess "a valid driver's license," and

no CDL requirements are set out. (Ex. N). Per Hamilton, McDaniel was not required to undergo a

DOT physical because his job duties as a Safety Technician did not require him to drive commercial

vehicles on or off site. (Id.). On December 5, 2011, McDaniel was replaced by Robert Garrett who,

likewise, did not have to take a DOT physical for the same reason. (Id.; Ex. O). Like McDaniel,

Garrett's hiring letter stated that he is only required to possess "a valid driver's license;" with no

CDL requirements set out. (Ex. O). Upon his hire, Garrett executed a job description for a "Safety

Specialist" position—not that of the Safety Technician/Safety Trainer position. (Ex. O, p. 2-3).On

May 8, 2012, Garrett was replaced by Duwayne Foster who, likewise, did not have to take a DOT

physical for the same reasons. (Id.; Ex. P, p. 1).

## II.   ARGUMENT

### A.   Summary Judgment Standard

Plaintiff adopts the summary judgment standard as set forth in *Clark v. Coats & Clark*, 929

F.2d 604 at 608 (11th Cir. 1991), and as set forth by the Supreme Court in *Reeves v. Sanderson*

*Plumbing Products*, 120 S.Ct. 2097 (2000).

### B.   TKIPS Violated the ADA by Subjecting Toole to an Improper Medical Inquiry

"The ADA was enacted 'to provide a clear and comprehensive national mandate to end

discrimination against individuals with disabilities and to bring persons with disabilities into the

---

[25] Per Hamilton, the term Safety Technician is one of several job titles that refers to the
position for which Toole was hired. (DX 7, ¶7).

economic and social mainstream of American life.'" Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1212 (11th Cir. 2010)(quoting H.R. Rep. No. 101-485(II) at 23 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 304). The ADA makes it illegal for a "covered entity" to "discriminate against a qualified individual with a disability," and restricts an employer's ability to make medical examinations or inquiries that relate to an applicant's disability status. 42 U.S.C. §§ 12112(a) & (d).

In an applicant's pre-offer stage, "a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability." § 12112(d)(2)(A) and 29 C.F.R. § 1630.13. TKIPS violated this proscription when it required Toole, as an applicant, to submit to a pre-offer DOT physical exam on March 24, 2011, at IMC. TKIPS argues only that Toole had been hired prior to the exam. However, TKIPS' 2011 and 2012 submissions to the E.E.O.C. and Hamilton's sworn November 2, 2011, Declaration and deposition testimony undercut that assertion. These items in and of themselves create factual dispute as to Toole's actual employment status at the time of the DOT physical exam. At the E.E.O.C. level TKIPS stated that it had not hired Toole and that the IMC medical exam was part of the "application process"–not part of some post-offer, pre-employment hiring process now aver. (Faircloth Ex. 14, p. 1-2). Hamilton has sworn that he never discussed with Toole his application for hire–much less extended an offer of employment. (Ex. I). Hamilton recalls that he had **not** made a hiring decision when he spoke with Toole and did not convey a hiring decision to Toole. (Hamilton 104-105, 111-112, 114). There is no undisputed evidence of record that an actual "offer" for hire was made to Toole. Thus, a trier of fact could find that TKIPS violated the ADA when it subjected Toole to a DOT physical exam prior to an actual job offer being extended.

TKIPS also argues that it complied with § 12112(d)(3) where, "[a] covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if– (A) all entering employees are subjected to such an examination regardless of disability." However, it is not undisputed that TKIPS required **all** of its entering employees to undergo such an exam. The Hoffman employees hired on as drivers with TKIPS did not have to undergo DOT physical exams for conditional employment. (Faircloth 101, 105-107). And it is undisputed that TKIPS hired Matt McDaniel, Robert Garrett, and Duwayne Foster as Safety Technicians with no requirement that any of them to undergo a DOT physical exam. (DX 7, ¶7; Ex. N, O and P). Thus, a trier of fact could find that TKIPS violated the ADA even if an actual offer of employment had been made to Toole prior to the DOT physical being conducted.

### C.     TKIPS Denied the Plaintiff Employment in Violation of the ADA

It is unlawful to, "discriminate against a qualified individual on the basis of disability in regard to job application procedures [and] hiring..." 42 U.S.C. §12112(a).  Toole can establish a *prima facie* case of discrimination by proving that: (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability. Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. Fla. 1996). TKIPS does not dispute that Toole has a disability and argues only that (1) Toole is not "a qualified individual"; (2) Toole cannot establish he was not hired due to his monocular vision; (3) TKIPS' reasons for not hiring Toole are not pretextual; and (4) TKIPS has established the "business necessity" defense. [Doc. 29].   TKIPS has conceded any arguments as to other elements or defenses as, "the onus is upon the parties to formulate arguments." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).

21

### 1.   *Toole is a Qualified Individual Under the ADA*

To prove that he is "qualified" under the ADA, Toole must show that he can perform the "essential functions" of the job. 42 U.S.C. § 12111(8). A job's "essential functions" are fundamental job duties of the employment position not including the marginal functions of the position. 29 C.F.R. § 1630.2(n)(1). TKIPS argues that Toole is not a "qualified individual" because he did not complete or pass the DOT physical; and that he cold not perform the alleged "essential functions" of the safety position of driving CMVs and non-CMVs on and off site. [Doc. 29, p. 18-20]. However, "[e]ssential functions" are **not** to be confused with "qualification standards," which an employer may establish for a certain position. Whereas "essential functions" are basic duties, 29 C.F.R. § 1630.2(n)(1), "qualification standards" are personal and professional attributes identified by the employer that may include physical, medical and safety requirements. 29 C.F.R. § 1630.2(q). In fact, disability discrimination includes the use of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

As held by the Ninth Circuit in Bates v. UPS,

[t]he difference is crucial. The ADA does not require that a person meet each of an employer's established 'qualification standards' to show that he is 'qualified.' And, indeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly cannot meet because of his disability and that forms the very basis of his discrimination.

2007 U.S. App. LEXIS 29870 (9th Cir. Cal. 2007). In arriving at this conclusion, the Bates court noted:

the plain language of the statute suffices to support our conclusion, it bears noting that the legislative history favors our reading as well. One of the Senate committee reports states that the qualification standard section of the ADA was meant to apply to "a person with a disability [who] applies for a job and meets all selection criteria **except** one that he or she cannot meet because of a disability." *S. Rep. No. 101-116*, at 37 (1989) (emphasis added). The legislative history also cites with approval Prewitt v. U.S. Postal Serv., 662 F.2d 292, 306 (5th Cir. 1981) (cited by *H. Rep. No. 101-485(III)*, at 42) (1990) reprinted in 1990 U.S.C.C.A.N. 445, 446, a Rehabilitation Act case that adopted the same *prima facie* case standard adopted here. See Prewitt, 662 F.2d at 306 (requiring the plaintiff to prove as part of his prima facie case "that he is qualified for the position under all **but** the challenged criteria" (emphasis added)).

Id. at 28-29 n. 6. As set out above, the presently challenged qualification standard of requiring Toole to pass a DOT physical cannot, *per se*, suffice as an essential function or job-related requirement/selection criteria for the job. Otherwise, an ADA plaintiff could never overcome the very discriminatory criteria he opposed. See Id. at 28-29. Per Dr. McDowell, a non-DOT standard physical exam would not have resulted in a hold on Toole's employment status based on his monocular vision. (McDowell 83-84). TKIPS does not contest that it has applied a qualification standard, the DOT physical, that has the effect of discriminating on the basis of disability and/or screens out a class of employees who cannot pass the DOT standards. To the contrary, it asserts the very use of this qualification standard as the reason Toole was not placed into the position. Faircloth has admitted, "it just seemed rather silly to have someone go through a DOT physical that was not going to be required to drive." (Faircloth 21). As a result, TKIPS later dropped the DOT physical as a universal requirement. Hamilton testified that if faced with disqualification via use of a DOT physical of an otherwise able employee, he would have taken steps to see if the person was able to perform the actual functions of the job regardless of the physical results and would have also cautiously discussed the matter with human resource administrators because to him, "that would be

23

walking a tight rope with ADA if it wasn't properly handled. Just to terminate the subject because he had a medical issue." (Hamilton 194). Such discrimination violates the ADA unless TKIPS can prove a valid defense to its use of the DOT standard. Bates, 2007 U.S. App. LEXIS 29870, 40-41.

Alternatively, even if the DOT physical is found not to be a discriminatory qualification standard, there are disputed issues of material fact as to whether or not driving CMVs off site (which would require a CDL and DOT physical exam) was actually an "essential function" of the safety position sought by Toole. The crux of TKIPS' legal argument is predicated on an incorrect assumption that driving formed an essential function of the job duties in the position sought by Toole. Evidence of whether a function is actually essential includes: (1) the employer's judgment; (2) written job descriptions prepared **before** advertising or interviewing applicants; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the employee to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past employees in this position; and (7) the current work experience of employees in similar jobs. § 1630.2(n)(3). At the time of Toole's consideration for the safety job Hamilton's judgment as to the functions of the job did not require a CDL and Toole was not told that his main job duties would require driving of any kind. (Toole 56, 144, 238-240, 243-244, 251; Hamilton 60, 116-119). It is undisputed that no written job descriptions for the position existed **prior** to the application/hiring process–there was not even a job title at the time.[26]  (Hamilton 68-70). It is undisputed that prior

---

[26] Because the employer's "motive and intent are at the heart of a discrimination case," the central inquiry "is whether [disability] was a factor in the employment decision at the moment it was made," and the employer is prohibited from inventing a "post hoc rationalization for its actions at the rebuttal stage of the case."  Sabree v. United Bhd. of Carpenters & Joiners Local No. 33, 921 F.2d 396, 403-404 (1st Cir. 1990)(citing EEOC v. Alton Packaging Corp., 901 F.2d 920, 925 (11th Cir. 1990).

safety employee, Preston Howard, was not required to possess a CDL and did not drive as part of his essential job duties. (Hamilton 133). It is undisputed that more recent/current employees in the Safety Technician position such as McDaniel, Garrett and Foster, were not required to possess a CDL or subjected to a DOT physical. *Supra.,*p. 18-19.

Additionally, there are genuine issues of disputed fact as to whether or not Roberts was, in fact, actually placed into the vacant position sought by Toole in March 2011 as **now** alleged by TKIPS at summary judgment and if Roberts is thus not a proper comparator for the alleged duties of the position: (1) as of October 2011 and November 2012 TKIPS took the position that no one had filled the position and failed to identify Roberts as the person who filled the job allegedly in April 2011;(2) TKIPS provided starkly contrasting job duties for the safety position to the E.E.O.C. in 2011 and 2012 in comparison to those now submitted as the duties performed by Roberts in the Safety Trainer position; (3) TKIPS failed to produce the job description for the Safety Technician/Safety Trainer position as late as November 2012, despite now relying upon it as a key piece of evidence in support of its defense; (4) no such job description existed at the time Toole was considered for the position; (5) Hamilton admittedly never relied upon said job description in considering hiring anyone into safety at TKIPS; (6) there are no personnel records establishing Roberts was ever even employed in the Safety Department until May 2012; (7) Roberts testified he was promoted to a position in April 2011 in the **Transportation Department**, not in the Safety Department; and (8) Roberts testified he has never held the position of Safety Technician/Safety Trainer as now purported by TKIPS to be the title of the position sought by Toole and filled by Roberts. And even if it could be proven that Roberts did assume the actual position sought by Toole in March 2011, the record shows that Robert's driving duties performed in that position: (1) are not

enumerated as essential functions of the written Safety Technician/Safety Trainer job description, and (2) were merely "incidental" to his essential functions under the written Safety Technician/Safety Trainer job description. Based on the evidence of record, a trier of fact could determine that driving CMVs on and off site was not an essential function of the position actually sought by Toole.

TKIPS admits that other than the discriminatory qualification standard, *i.e.*, the DOT physical exam, Toole was qualified to perform the essential functions of the job. Hamilton testified that he had decided to hire Toole based on his experience in the mill, understanding of the environment and his prior experience in safety; that he felt hiring Toole was an advantage because Toole was already experienced at the job site in a safety capacity and he envisioned how he could use Toole considering Toole's experience and Hamilton's needs; and that **Toole possessed the necessary skill sets to bring in.** (Hamilton 57-58, 115-116, 165-166). Thus, a trier of fact could find that Toole was qualified to perform the essential functions of the job for which he was to be hired.  There is also evidence of record that Toole requested the reasonable accommodation of waiving the DOT physical exam in order to obtain employment–yet, that request was denied. *Supra.*, p. 11. Based on Hamilton's testimony above, Toole was qualified to have performed the duties of the safety position at the time with this reasonable accommodation. And the accommodation was undisputedly reasonable as Hamilton has testified that if faced with disqualification via a DOT physical of an otherwise able employee, he would have taken steps to find out of the person could have performed the job despite the disqualification on the physical exam and would have cautiously discussed the matter with human resource administrators because to him, "that would be walking a tight rope with ADA if it wasn't properly handled. Just to terminate the subject because he had a medical issue." (Hamilton 194). The record shows that TKIPS did not require all employees (in both driver and

safety positions) to actually possess CDLs–thus a waiver of the DOT exam would not have been inconsistent with its business practices. Further, removal of the DOT physical exam requirement for all employees did, in fact, occur as, "it just seemed rather silly to have someone go through a DOT physical that was not going to be required to drive." (Faircloth 21).  Thus, a trier of fact could find that Toole's request to waive the DOT physical was reasonable and unlawfully denied.

The cases relied upon by TKIPS are easily distinguishable from the case at bar. In Talbot v. Md. Transit Admin., the plaintiff was seeking a job as a city bus driver–a job **the** essential function of which is undeniably driving a commercial vehicle on public roads–and the defendant had consistently required **all** of its bus drivers to satisfy the federal medical standards. 2012 U.S. Dist. LEXIS 163863 (D. Md. Nov. 15, 2012). In Albertson's, Inc. v. Kirkingburg, the plaintiff was in the position as an over the road truck driver–a job **the** essential function of which is undeniably driving a commercial vehicle on public roads and which is directly regulated by the FHWA and DOT. 527 U.S. 555, 573 (U.S. 1999).  And in Chandler v. City of Dallas, the court was faced with city employees who undisputedly "drive on public roads as an intrinsic part of their job duties."  2 F.3d 1385, 1388 (5th Cir. Tex. 1993).  Not one of these factual scenarios is comparable to the case at bar as the alleged "driving" functions of the safety position for which Toole applied are in heated dispute,  TKIPS has not consistently applied a DOT physical requirement to its Safety or driving employees, and TKIPS was not under direct FHWA or DOT regulations such that TKIPS drivers were not all required to posses a CDL.

### 2. *Toole Was Discriminated Against Because of His Disability.*

TKIPS argues the "but for" standard set out in Gross v. FBL Financial Services, Inc., as to ADEA claims is applicable to the present ADA claim. 557 U.S. 167, 180 (2009). However, to date,

neither the Supreme Court nor the Eleventh Circuit have made such a leap in applying the Gross

holding to ADA discrimination claims.[27] Even if TKIPS is correct that the holdings in Gross and

Nassar apply in the present case, TKIPS fails to define how that would devalue Plaintiff's evidence.

If TKIPS is proposing that a "but-for" interpretation requires that Plaintiff prove that his disability

(or its failure to accommodate same) is the "sole" reason for his action, then it is incorrect.  Burrage

v. United States, 517 U.S. ___, 2014WL273243 (Slip Opinion, PP.6-9)(Ex. Q); and Black's Law

Dictionary 250 (9th ed. 2009)(defining "but-for cause" as "[t]he cause without which the event could

not have occurred-[a]lso termed actual cause; cause in fact; factual cause").

     Recently in Burrage, the Supreme Court reviewed its decisions in Gross and Nassar, both of

which had interpreted the meaning of "but-for" in context of employment discrimination law,

expounding on its reasoning as follows:

> A thing "results" when it "[a]rise[s] as an effect, issue, or outcome from some action,
> process or design." 2 *The New Shorter Oxford English Dictionary* 2570 (1993).
> "Results from" imposes, in other words, a requirement of actual causality. "In the
> usual course," this requires proof "'that the harm would not have occurred' in the
> absence of - that is, but for - the defendant's conduct."  University of Tex.
> Southwestern Medical Center v. Nassar, 570 US.__,)) (2013 (slip op., at 5-6)
> (quoting Restatement of Torts §432, Comment a (1934)). The Model Penal Code
> reflects this traditional understanding; it states that "[c]onduct is the cause of a result"
> if "it is an antecedent but for which the result in question would not have occurred."
> §2.03(1)(a). That formulation represents "the minimum requirement for a finding of
> causation when a crime is defined in terms of conduct causing a particular result." Id.,
> Explanatory Note (emphasis added); see also Unites States v. Hatfield, 591 F.3d 945,
> 948 (CA7 2010) (but for "is the minimum concept of cause"); Callahan v. Cardinal
> Glennon Hospital, 863 S.W. 2d 852, 862 (Mo. 1993) (same).

---

[27] "[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by
the holding of the first panel to address an issue of law, unless and until that holding is overruled
by the Supreme Court," thus even if a published panel of the Eleventh Circuit suggests otherwise,
it may be preceded by an initial decision which is, in fact, binding. See  Terpo v. RBC Bank,
2013 WL 5519704 * 8, n. 17 (N.D. Ala. Oct. 2013), quoting United States v. Hogan, 986 F.2d
1364, 1369 (11th Cir. 1993).

\* \* \*

Where there is no textual or contextual indication to the contrary, courts regularly read phrases like "results from" to require but-for causality. Our interpretation of statutes that prohibit adverse employment action "because of" an employee's age or complaints about unlawful workplace discrimination is instructive. Last Term, we addressed Title VII's anti-retaliation provision, which states in part:

> "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U. S. C. §2000e-3(a) (2006 ed.)

Given the ordinary meaning of the word "because," we held that §2000e-3(a) "require[s] proof that the desire to retaliate was [a] but-for cause of the challenged employment action." Nassar, *supra*, at__ (slip op., at 11- 12). The same result obtained in an earlier case interpreting a provision in the Age Discrimination in Employment Act that makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U. S. C. §623(a)(1) (emphasis added). Relying on dictionary definitions of "[t]he words 'because of'"-which resemble the definition of "results from" recited above-we held that "[t]o establish a disparate treatment claim under the plain language of [§623(a)(1)]. . . a plaintiff must prove that age was [a] 'but for' cause of the employer's adverse decision." Gross v. FBL Financial, 557 U.S. 167, 176 (2009).4

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), is not to the contrary. The three opinions of six Justices in that case did not eliminate the but-for-cause requirement imposed by the "because of" provision of 42 U.S.C. §2000e-2(a), **but allowed a showing that discrimination was a "motivating" or "substantial" factor to shift the burden of persuasion to the employer to establish the absence of but-for cause**. See University of Tex Southwestern Medical Center v. Nassar, 570 U.S. __, (2013) (slip op., at 7-10). Congress later amended the statute to dispense with but-for causality. Civil Rights Act of 1991, Tit. I, §107(a), 105 Stat. 1075 (codified at 42 U.S.C. §2000e-2(m)).

Burrage, 571 U.S.___,___(slip opinion, pp. 6 - 9)(emphasis added).  The Supreme Court has made

it clear that for an action to be the "but-for" cause of a later event, it need not be the only, or final,

action, and certainly not be the sole action.  It need not even be a substantial action when compared

to other non-essential contributing actions.  It is sufficient merely if the action was "the straw the broke the camel's back." Burrage, (slip opinion, p. 7).

The Eleventh Circuit is in accordance. Sims v MVM , 704 F3d 1327, 1333 (11th Cir. 2013). ("the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," and a triable issue of fact exists "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."); Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1334 (11th Cir. 1999) (the ADA's "because of" causation "merely imposes a 'but for' liability standard" which requires showing only that disability was "a determinative, rather than the sole, decision making factor"); McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077 (11th Cir. 1996) (noting that in *Price Waterhouse* "all of the justices agreed that 'because of,' as used in Title VII, does not mean 'solely because of'").

TKIPS argues that it cannot be shown that it discriminated against Toole because of his disability because there is no evidence that TKIPS was aware of Toole's monocular vision. To the contrary, the evidence shows that as of March 30, 2011, TKIPS had received the IMC Medical Report–pursuant to standard IMC operating procedure at the time–which clearly stated that Toole suffered from monocular vision.[28] Toole has testified that in response to his post-DOT physical inquiries about the job he was first informed by Hamilton that he was still waiting to get the Medical Report, and that he was subsequently told by Hamilton that he could not be hired because he had failed the vision portion of the physical exam.  TKIPS now avers that it thereafter gave the safety position to Roberts on April 17, 2011. Unlike the cases cited by TKIPS in support of it's Motion,

_____

[28] Notably, no evidence of Toole's blood pressure is set out on the Medical Report.

30

vague, conclusory statements about Toole's vision were not the basis for the employment decision. Hamilton told Toole that he was waiting on the IMC Medical Report to make his hiring decision and once it was received by TKIPS on March 30, 2011, he decided not to hire Toole. The Medical Report clearly indicated "Yes" as to Toole's "Monocular Vision." (Faircloth Ex. 14, p. 10). There is no other basis on the Medical Report for Toole to have failed the visual portion of the exam–there is no other evidence of record as to how Hamilton would have known of the vision exam failure. Hamilton then specifically told Toole he was not being hired because he did not pass the vision portion of the exam. Based on this evidence, a trier of fact could find that TKIPS and Hamilton had been made aware of Toole's specific disability and that it was because of this knowledge that Hamilton elected not to hire Toole. See Sims v MVM, 704 F3d at 1333 ("the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent").

### 3.   *TKIPS' Alleged Reasons for Failing to Hire Toole are Pretextual*

Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. Hall v. Ala. Ass'n of Sch. Bds., 326 F.3d 1157, 1166 (11th Cir. 2003). TKIPS fails to meet its burden in providing legitimate **non-discriminatory** reasons for failing to hire Toole. TKIPS avers it did not hire Toole because: (1) he failed the vision portion of the DOT physical; and (2) he did not complete the actual physical portion of the exam. These reasons, however, are not non-discriminatory, as set out in detail above. *Supra §*II(C)(1). The use of the DOT physical as a "qualification standard[]...that screen[s] out or tend[s] to screen out an individual with a disability or a class of individuals with disabilities..." is unlawful discrimination.

31

42 U.S.C. § 12112(b)(6). TKIPS' sole basis for it's action against Toole is the use of and results from the DOT physical to which Toole was subjected.  Yet, "it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly cannot meet because of his disability and that forms the very basis of his discrimination." Bates, 2007 U.S. App. LEXIS 29870 (9th Cir. Cal. 2007). TKIPS' argument that it lacked discriminatory intent because it placed Roberts into the position despite his medical conditions likewise fails to meet this burden as the record is replete with disputed facts about whether or not Roberts was actually placed into the safety position **at the time** of the adverse employment decision as even TKIPS appeared to be unaware of this "fact" both in October 2011 and November 2012 when it failed to reveal such information to the E.E.O.C., instead stating that the position had not been filled. See Turnes v. Amsouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. Ala. 1994)(an employer fails to meet its burden of production when it provides a reason that it either did not know or was unavailable at the time it made its decision); see also Sabree v. United Bhd. of Carpenters & Joiners Local No. 33, 921 F.2d 396, 403-404 (1st Cir. 1990)(citing EEOC v. Alton Packaging Corp., 901 F.2d 920, 925 (11th Cir. 1990)(because the employer's "motive and intent are at the heart of a discrimination case," the central inquiry "is whether [disability] was a factor in the employment decision at the moment it was made," and the employer is prohibited from inventing a "post hoc rationalization for its actions at the rebuttal stage of the case."). Thus, TKIPS has failed to meet its burden in articulating a non-discriminatory reason for its actions. When a defendant fails to meet this burden, the burden does not shift to the plaintiff to make a showing of the pretextual nature of "legitimate" reasons which have not been offered, and the established presumption of discrimination stands. See Meeks v. Computer Associates Intern., 15 F.3d 1013, 1021 (11th Cir. 1994).

Assuming TKIPS did meet its burden at this stage, ample evidence of record exists to show that TKIPS' alleged reasons for failing to hire Toole are pretextual. TKIPS avers that all employees were subject to the DOT physical exam and that it was required for the position; yet the record shows this statement to be false both as to drivers and safety personnel both before and after Toole was denied employment. TKIPS relies upon Toole's failure of the DOT physical exam as the basis for its actions; however Hamilton's testimony belies that such reliance would actually have motivated TKIPS as he stated that he would not allow a failed DOT physical to prevent an employee in the Safety Trainer position from performing the job without some further investigation and consultation, regardless of the DOT exam results. As such, there are genuine issues of material fact as to whether the proffered reason was sufficient to have motivated the adverse action. See Walker v. NationsBank of Florida, 53 F.3d 1548, 1564 (11th Cir. 1995)(plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision); and Hamilton v. Montgomery County Bd. of Educ., 122 F.Supp. 1273, 1281 (M.D. Ala. 2000)(plaintiff can demonstrate pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons ...that a reasonable factfinder could find them unworthy of credence...The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation.").

TKIPS avers that it replaced Toole with Roberts, a person with medical conditions. However, as set out in detail above, the record is replete with conflicting facts as to whether Toole's position was ever filled, the nature of Roberts' actual positions, Roberts' actual duties, and TKIPS' business

practices under which many drivers and safety personnel were not required to take a DOT physical or hold a CDL. As set out in great detail above, TKIPS and its agents have submitted multiple conflicting statements and testimony regarding their actions which resulted in Toole's failure to be hired. When a defendant submits, "two diametrically opposed positions, the court determines that a reasonable jury could conclude that [plaintiff] is able to satisfy the third element." Terpo v. RBC Bank (USA), 2013 U.S. Dist. LEXIS 142448, 36-37 (N.D. Ala. Oct. 2, 2013), citing *Cf., e.g.*, Bechtel Constr. Co. v. Secretary of Labor, 50 F.3d 926, 935 (11th Cir. 1995) ("The pretextual nature of Bechtel's terminating Nichols is further demonstrated by Bechtel's shifting explanations for its actions."); Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194 (11th Cir. 2004) ("When pressed on the reason why infomercials were prohibited, Concello shifted from a contract, to a non-compete agreement, to an unwritten policy, to a standard industry practice.").

### 4.    *TKIPS Cannot Establish the "Business Necessity" Defense*

TKIPS bears the burden to that "the qualification standard is (1) 'job-related,' (2) 'consistent with business necessity,' and (3) that 'performance cannot be accomplished by reasonable accommodation.'" 42 U.S.C. § 12113(a). To benefit from the affirmative defense, TKIPS must prove that DOT exam is job-related **and** consistent with business necessity. Id. (emphasis added). This burden is generally quite high. Hamer v. City of Atlanta, 872 F.2d 1521, 1535 (11th Cir. 1989). As this Circuit has explained, "[j]ob[-]relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer in making hiring or promotional decisions." Hamer, 872 F.2d at 1533. Business necessity, "is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria in hiring or promotional decision making." Id. TKIPS "must carry a heavy burden of proof to show business

'necessity' for the employment practice."[29] <u>Smith v. Olin Chemical Corp.</u>, 555 F.2d 1283, 1286 (5th Cir. La. 1977), citing <u>Sagers v. Yellow Freight System, Inc.</u>, 529 F.2d 721, 730 n. 18 (5th Cir. 1976) (this test is "a strict one" and the job requirement must be shown to be essential to the safe and efficient operation of the business). TKIPS has failed to make this showing.

TKIPS relies solely on its argument that Toole was not qualified because he did not pass the DOT physical as the basis for this defense. [Doc. 29, p. 29].  For the reasons already set forth and argued above, *supra.* §II(C)(1) and (3), genuine issues of material fact exist as to whether the requirement of Toole to take a DOT physical was: (1) in fact, a job related test or criteria actually used by TKIPS in making hiring or promotional decisions; and (2) predicated upon an actual business reason that made use of the test necessary in light of the fact that many drivers and safety personnel were not required to hold a CDL or take the DOT exam.

In addition, Toole has shown that he requested a reasonable accommodation, a waiver of the DOT exam or hiring despite the results, which has been made for others at TKIPS and which is something that Hamilton would, admittedly, consider reasonable. <u>Allmond v. Akal Sec. Inc.</u>, 558 F.3d 1312, 1316-1317 (11th Cir. Ga. 2009)(Once an employer demonstrates the pertinent qualification standard is job-related and consistent with business necessity, the plaintiff may offer a reasonable accommodation that would allow him to satisfy that standard). Yet TKIPS refused to grant this accommodation.

---

[29] In defining the business-necessity defense under the ADA, this Circuit looks to cases analyzing the defense under Title VII. <u>Allmond v. Akal Sec. Inc.</u>, 558 F.3d 1312, 1317 n. 6 (11th Cir. Ga. 2009). Title VII requires the elimination of artificial, arbitrary and unnecessary barriers to employment that operate to invidiously discriminate. <u>Smith v. Olin Chemical Corp.</u>, 555 F.2d 1283, 1286 (5th Cir. La. 1977).

## III.      CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Defendant's Motion be denied as the

Defendant has failed to meet its burden and genuine issues of material fact exist as to all of Plaintiff's

claims.

Respectfully submitted,

_s/Temple D. Trueblood_
Temple D. Trueblood
Counsel for Plaintiff

OF COUNSEL:
Wiggins, Childs, Quinn & Pantazis, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

OF COUNSEL:
HENRY BREWSTER, L.L.C.
205 North Conception Street
Mobile, Alabama 36603
(251) 338-0630

OF COUNSEL:
EDWARD L.D. SMITH
Post Office Box 1643
Mobile, Alabama 36633-1643
(251) 432-0447

## CERTIFICATE OF SERVICE

I hereby certify that on this the 28th day of February, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David L. Warren, Jr.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
420 20th Street North, Suite 1900
Birmingham, AL 35203-3212
Telephone: (205) 328-1900
Facsimile: (205) 328-6000
david.warren@ogletreedeakins.com

s/Temple D. Trueblood
OF COUNSEL