# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| FRANK L. TOOLE, | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 13-00145-KD-B** |
| | ) | |
| METAL SERVICES LLC d/b/a | ) | |
| PHOENIX SERVICES, LLC, | ) | |
|     **Defendant.** | ) | |

## ORDER

This action is before the Court on the Motion for Summary Judgment (Doc. 28) filed under Federal Rule of Civil Procedure 56 by Defendant Metal Services LLC d/b/a Phoenix Services, LLC ("Metal Services"). In support of the motion, Metal Services has filed a memorandum (Doc. 29), evidentiary material (Docs. 30-36), and suggested determinations of undisputed fact and conclusions of law (Doc. 37). Plaintiff Frank L. Toole ("Toole") has timely filed a Response in opposition (Docs. 40-41) and supporting evidentiary material (Docs. 42-57), to which Metal Services has timely filed a Reply (Doc. 61). Contemporaneous with his Response to the Motion for Summary Judgment, Toole also filed a Motion to Strike (Doc. 58), to which Metal Services has timely filed a response (Doc. 62). After the motion for summary judgment was taken under submission, Toole, with leave of the Court, filed a memorandum of supplemental authority (Doc. 63), to which Metal Services has timely responded (Doc. 65).

Both motions have been taken under submission and are ripe for adjudication. (See Docs. 38, 60). Upon consideration, and for the reasons stated herein, the Court finds that the Motion for Summary Judgment (Doc. 28) and that the Motion to Strike (Doc. 58) are **due to be DENIED**.

## I.    Procedural History

On March 27, 2013, Toole initiated this action by filing a Complaint (Doc. 1) asserting a

cause of action against Metal Services[1] under the Americans with Disabilities Act of 1990, 42

U.S.C. § 12101 *et seq.*, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325,

122 Stat. 3553 (effective Jan. 1, 2009) (hereinafter, the "ADA").  On June 4, 2013, Toole filed an

Amended Complaint (Doc. 7), the operative complaint in this action.  See, e.g., Malowney v. Fed.

Collection Deposit Grp., 193 F.3d 1342, 1345 n.1 (11th Cir. 1999) ("An amended complaint

supersedes an original complaint.").   The Amended Complaint alleged the following causes of

action against Metal Services:

- Count I – Unlawful discrimination in violation of the ADA.  Specifically, that Toole applied and was qualified for the position of Safety Technician with Metal Services but that Metal Services failed to hire him due to his disability ("*i.e.*, no vision in his left eye and/or the Defendant's perception of [Toole] as disabled.").  (Doc. 7 at 4).

- Count II – Improper medical inquiry in violation of the ADA.  Specifically, that, when he applied for the position of Safety Technician with Metal Services, Metal Services "unlawfully required [Toole], a pre-offer applicant, to be subjected to an improper medial inquiry/exam."  This examination was allegedly "not job related" and "was, instead, required by the Defendant in order to identify and exclude persons with disabilities or perceived disabilities, such as [Toole], from consideration for employment."  Metal Services allegedly "failed to hire" Toole due to his disability as a result of these "improper medial exam/inquiries . . ."  (Doc. 7 a 5).[2]

---

[1] Toole originally identified the Defendant in this action as "Thyssenkrup InPlant Services, LLC d/b/a Phoenix InPlant Services, LLC."  However, based upon representations made by the Defendant, and with no objection from Toole, "Metal Services LLC d/b/a Phoenix Services, LLC" was substituted as the proper Defendant in this action.  (See Doc. 24).

[2]      As all of Toole's claims are asserted under federal statutes, the Court has original jurisdiction over this entire action under 28 U.S.C. § 1331.

Toole alleges, and Metal Services does not dispute, that he has satisfied all administrative prerequisites prior to bringing this ADA action.  See (Doc. 7 at 1-2, ¶ 2; Doc. 25 at 2, ¶ 2); Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."); McClinton v. Alabama By-Products Corp., 743 F.2d 1483, 1485 (11th Cir. 1984) (holding that ADEA "notification requirement is not a jurisdictional prerequisite that deprives a court of subject matter jurisdiction, but a requirement more in the nature of a statute of limitations that is subject to equitable tolling").

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56(c) governs procedures and provides as follows:

**(1)** ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2)** ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3)** ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

**(4)** ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  As the Eleventh Circuit has articulated, however,

The nature of this responsibility varies . . . depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-

movant would bear the burden of proof at trial.

. . . Celotex requires that for issues on which the movant would bear the burden of proof at trial,

> that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

[United States v. ]Four Parcels[ of Real Property], 941 F.2d [1428, ]1438[ (11th Cir. 1991)] (citations and internal quotation marks omitted; emphasis in original).

For issues, however, on which the non-movant would bear the burden of proof at trial,

> the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

Four Parcels, 941 F.2d at 1437-38 (citations, footnote, and internal quotation marks omitted; emphasis in original).

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. Coats & Clark, 929 F.2d at 608. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial-that is, such that no reasonable jury could find for the non-movant-should the movant be permitted to prevail without a full trial on the issues. Anderson[ v. Liberty Lobby,

Inc.], 477 U.S. [242,] 249-50, 106 S. Ct. [2505,] 2511[ (1986)].

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Celotex, 477 U.S. at 332, 106 S. Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. See Melissa L. Nelkin, One Step Forward, Two Steps Back: Summary Judgment After Celotex, 40 Hastings L.J. 53, 82-83 (1988).

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (headings and footnotes omitted).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (citation omitted).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992)

(internal citations and quotations omitted).

### III.    Facts[3]

ThyssenKrupp InPlant Services ("TKIPS")[4] began operations at the ThyssenKrupp ("TK") plant in Calvert, Alabama, in 2009.  TKIPS packaged and transported steel for TK.  Initially, this work involved loading, transporting, and unloading twenty-five ton metal slabs via two hundred ton trucks to warehouses, picking up and transporting the finished steel coils (which weighed 35,000-65,000 lbs.), packaging them, and loading them for transport.  TKIPS' drivers drove a variety of trucks, including luggers, roll-offs, semis, forty-eight wheel slab haulers, stackers, sample trucks, and flatbeds.  Each of these trucks had a gross vehicle weight ratio of over 26,001 lbs.  (Undisputed Facts, see Doc. 37 at 2, 3, ¶¶ 1-3, 7-8; Doc. 40 at 1, 3, ¶¶ 1-3, 7-8).

Art Hamilton ("Hamilton") began working at TKIPS on February 15, 2011, as a Phoenix Services representative and as the transportation and logistics Site Manager.  At the time, TKIPS

---

[3]    The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [Toole,] the nonmoving party." E.g., Benson v. Tocco, Inc., 113 F.3d 1203, 1207 (11th Cir. 1997).  In addition, the Court notes that

> [p]arties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions. Similarly, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). Accordingly, the Court's review of the parties' submissions is limited to the portions to which they have specifically cited.

Preis v. Lexington Ins. Co., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007) (Steele, J.), aff'd, 279 F. App'x 940 (11th Cir. 2008) (footnote omitted). See also Sharpe v. Global Sec. Int'l, 766 F. Supp. 2d 1272, 1282 (S.D. Ala. 2011) (Steele, C.J.) ("[T]he Court . . . will not independently examine uncited portions of the record in search of support for a particular proposition[ on summary judgment]." (citing cases)); Fed. R. Civ. P. 56(c)(3) (On summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record.").

[4] On January 18, 2012, Phoenix Services, LLC acquired a majority interest in TKIPS, and, at that time, the name of the business changed to Metal Services LLC d/b/a Phoenix Services, the named defendant in this action.  (Undisputed Facts, see Doc. 37 at 2, ¶ 1 n.1; Doc. 40 at 1, ¶ 1).

was having problems with driver accidents that caused equipment damage and drew complaints from its only customer TK. In March 2011, ThyssenKrupp required Hamilton to address and correct these problems, as well as problems in Packaging, and told him that if they continued, there would be serious consequences, including a determination that TKIPS was in breach of contract. Hamilton decided that TKIPS needed additional safety employees. At the time, TKIPS had only one safety employee, Preston Howard ("Howard"), who was hired as a Safety Specialist on January 12, 2011. Howard investigated accidents, filled out accident reports, and monitored employees for safe job performance. Howard did not train drivers in his role as Safety Specialist. (Undisputed Facts, see Doc. 37 at 3-4, ¶¶ 9, 11-16; Doc. 40 at 3-4, ¶¶ 9, 11-16). Howard also did not possess a commercial driver's license ("CDL"). (Doc. 56 at 60 [Hamilton Depo., p. 133]).

Sometime in March 2011, Toole, who was working at the TK Calvert facility for another company, heard that TKIPS was looking to hire additional safety positions and spoke with Hamilton about the position. (Doc. 56 at 13-14, 19-20 [Hamilton Depo., pp. 54-55, 61-62]; Doc. 31-2 at 24-25 [Toole Depo., pp. 134-137]). At their first meeting, Toole told Hamilton that his current position would be ending soon and told him of his job experience. (Doc. 56 at 43 [Hamilton Depo., p.104]). At the time, Hamilton "wasn't certain what direction [he] was going to go in" and "was still contemplating what [he] was going to do." (Id. at 43-44 [pp. 104-105]). At their first meeting, Hamilton described his needs to Toole as follows:

> I needed additional safety people, I needed someone to train and enforce policy, and the pre trip inspections, monitoring the drivers, eliminating the driver error on incidences and property damage. It was . . . a new position we were going to have to establish and enforce and I was going to need someone with this type of experience in order to work with these people, the drivers and the trucks, and to train and be firm and disciplined in what we were doing.

(Doc. 56 at 44-45 [Hamilton Depo., pp 105-06]). In another conversation, Hamilton told Toole that he "needed an enforcer in order to enforce safety, training, pre truck checks, inspections, monitoring

the drivers, teaching and training the drivers how to safely do things . . ." (Id. at 15 [p. 56]).

Toole applied for a safety position with TKIPS on March 18, 2011. On March 24, 2011, Toole went back to TKIPS's office and spoke with Eric Bayda ("Bayda"), TKIPS' Director of Human Resources, who told him he would mention Toole to Hamilton. Hamilton then walked up, and Bayda told him to hire Toole. (Undisputed Facts, see Doc. 37 at 6, ¶¶ 26-28; Doc. 40 at 5, ¶¶ 26-28). Toole gave Hamilton a copy of his resume, and within thirty minutes Hamilton called Toole back in for an interview with Hamilton, Howard, and Christian Koesling. At this time, Hamilton told Toole that Howard would be his boss, his rate of pay and that he was hired, pending a physical. Toole was told that he would be Hamilton's enforcer of safety rules and would make sure that drivers do pre-inspections of their trucks. Toole did not possess a commercial driver's license (CDL) but was told that none was required. (Doc. 42-1 at 16, 41-44, 80-81 [Toole Depo., pp. 56, 140-144, 238-39]; Doc. 56 at 54 [Hamilton Depo., p. 118]). Toole was not informed at the interview that he would be transporting people, operating equipment, or driving off-site. (Doc. 42-1 at 85-86 [Toole Depo., pp. 243-44]). Toole never saw a written job description for the safety position, nor was he ever told the title of the position. (Id. at 70, 79-80 [pp. 185, 237-38]).

Toole filled out and turned in new-hire paperwork on March 24, 2011, after which he was given forms to take with him to his physical exam at the Industrial Medical Clinic ("IMC") in Mobile, Alabama. Toole went to IMC for his physical that same day and was administered a Department of Transportation ("DOT") medical exam by Dr. William McDowell.[5] (Doc. 42-1 at 46-51 [Toole Depo., pp. 145-150]). On the IMC History and Review of Symptoms form, Toole disclosed having high blood pressure, taking blood pressure medication, and the removal of his left

---

[5] Prior to June 2011, all new TKIPS employees were sent for a DOT medical examination. Thereafter, packers (i.e. those who packaged steel coil) were sent for non-DOT physicals, while drivers continued to be sent for DOT physicals. (Doc. 43 at 10-11 [Faircloth Depo., pp. 18, 21]; Doc. 46 at 11 [McDowell Depo., p. 54]).

eye.[6] (Doc. 42-1 at 101). Toole's monocular vision (due to having only one eye) was noted on the IMC Medical Examination Report. (Doc. 42-1 at 103). Dr. McDowell told Toole he would need a waiver to obtain a DOT medical card. (Doc. 46 at 9 [McDowell Depo., p. 51]).

A nurse also took Toole's blood pressure, which measured 160/102. The nurse told Toole this was high and that he would need to make an appointment with a physician to get his blood pressure down. (Doc. 42-1 at 61-62, 106 [Toole Depo., pp. 167-68 & Ex. 27]. Toole's blood pressure results were not recorded in the IMC Medical Examination Report.[7] (Doc. 42-1 at 103).[8]

Dr. McDowell did not complete Toole's medical exam and told him that he could not do so until Toole obtained a DOT waiver for his vision. (Doc. 42-1 at 63, 104-05 [Toole Depo., p. 169 & Ex. 25]). Dr. McDowell placed Toole's physical on hold due to "BP" of 160/102 and "Monocular vision – will need a waiver." (Doc. 42-1 at 106 [Toole Depo., Ex. 27]). TKIPS's received a copy of Toole's IMC Medical Report, which is stamped "RECEIVED Mar 30 2011" on each page. (Doc. 43 at 78-81).

Toole quickly looked into obtaining a DOT waiver but claims he was informed that he could not get a waiver for his monocular vision if he did not hold a CDL. (Doc. 42-1 at 16, 64, [Toole Depo. pp. 56, 173]).[9] Multiple times he asked Hamilton and another TKIPS employee, Kameka

---

[6] Toole's left eye was surgically removed due to a cancerous tumor. He wears a glass eye in its place. (Doc. 42-1 at 34-35 [Toole Depo., pp. 94-95]).

[7] A guide on the report indicates that such a blood pressure reading would allow for a "[o]ne time certification for three months" and recertification "1 year from date of exam if 140/90 or less." (Doc. 42-1 at 103).

[8] Dr. McDowell testified that if an IMC patient's blood pressure is initially too high to pass a DOT medical examination, the standard procedure is to allow the patient to lie down and rest for a while to bring his blood pressure down. Dr. McDowell does not recall if Toole was allowed to do so. (Doc. 46 at 6-7 [McDowell Depo., pp. 46-47]).

[9] Toole asserts that, "[a]s [he] did not hold a CDL, the waiver was not attainable." (Doc. 41 at 10 n.1). In support of this assertion, Toole cites to his own testimony (Doc. 42-1 at 16) and Ex. 28 from his deposition,

Stovall, why he needed to pass a DOT medical exam if he was not going to be driving and requested that he either be given a waiver or that he be hired without a waiver. (Doc. 42-1 at 65-66, 69 [Toole Depo., pp. 175-76, 183]). Hamilton eventually informed Toole that he could not hire him because he failed the vision portion of the DOT medical exam. (Doc. 42-1 at 66, 76-77, 85 [Toole Depo., pp. 176, 234-35, 243]).

**IV.    Analysis**

"The ADA was enacted 'to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life.' " Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1212 (11th Cir. 2010) (quoting H.R. Rep. No. 101–485, pt. 2, at 23 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 304). As relevant to this action, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

As used in § 12112(a), "the term 'discriminate against a qualified individual on the basis of disability' includes . . . using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity . . ." 42 U.S.C. § 12112(b)(6). Toole appears to rely on § 12112(b)(6) when arguing in support of his Count One discrimination claim. (Doc. 41 at 23). The allegations in Toole's Amended Complaint

---

which appears to consist of a DOT waiver application and printouts of DOT regulations (Doc. 42-1 at 107-22). Toole has not pointed out which specific passages from Ex. 28, containing a number of pages of compact text, support this assertion.

also support such a claim.  (See, e.g., Doc. 7 at 3, ¶ 13 ("The physical examination required of Plaintiff is not job related and had a disparate impact on Plaintiff and other applicants in the same or similar position as Plaintiff.").

In addition, Toole claims that he was subjected to an improper medical inquiry.  "The prohibition against discrimination as referred to in [§ 12112(a)] shall include medical examinations and inquiries." 42 U.S.C. § 12112(d)(1).  See also Harrison, 593 F.3d at 1212 ("The A[DA] also restricts an employer's ability to make medical examinations or inquiries that relate to an applicant's disability status.  See § 12112(d).").  Pre-employment medical examinations are generally prohibited. 42 U.S.C. § 12112(d)(2). Moreover, a post-employment medical exam is prohibited unless all entering employees are subject to an exam and the results of the exam are not used to discriminate against a qualified individual on the basis of a disability. 42 U.S.C. § 12112(d)(3).

### a.    Discrimination (Count I)

"The burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims." Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000).  "Under this burden-shifting analysis, [Toole] ha[s] the initial burden of establishing a prima facie case of disability discrimination." Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004).  "To establish a prima facie case of disability discrimination, a plaintiff must show that he (1) is disabled, (2) is a 'qualified' individual, and (3) was subjected to unlawful discrimination because of his disability." Samson v. Fed. Exp. Corp., No. 12-14145, 2014 WL 1226847, at *3 (11th Cir. Mar. 26, 2014) (published) (citing Greenberg v. BellSouth Telecomms., Inc., 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted)) (footnote omitted).

Metal Services challenges Toole's ability to establish a *prima facie* case of ADA discrimination, arguing that Toole cannot establish either the second or third element.  (See Doc. 29

at 19, § B).[10]

### 1. "Qualified Individual"

"[A] 'qualified individual' is someone 'who, with or without reasonable accommodation, can perform the *essential functions* of the employment position that such individual holds or desires.' " Samson, 2014 WL 1226847, at *3 (quoting 42 U.S.C. § 12111(8) (emphasis added)). Therefore, Toole "must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation. Thus, if [Toole] is unable to perform an essential function of his []job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000) (addressing claim of disability discrimination under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, which is "governed by the same standards used in cases brought under the Americans with Disabilities Act . . .").

Metal Services argues that Toole is not a "qualified individual" because he did not complete or pass his DOT medical examination, did not request a reasonable accommodation, and was therefore unable to accomplish the essential function of "significant and frequent driving for a variety of job-related reasons[, which] entail driving a wide range of" commercial and non-commercial motor vehicles "on-site and off-site . . ." (Doc. 29 at 20-21). Toole disputes that driving was an essential function of the job he was offered and/or that the DOT medical examination was necessary to perform an essential function of the job. Toole has put forth undisputed evidence that

---

[10] Metal Services does not dispute that Toole's relevant condition – monocular vision – is a "disability" under the ADA, and the Court finds the record supports such a determination. See Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999) ("[O]ur brief examination of some of the medical literature leaves us sharing the Government's judgment that people with monocular vision ordinarily will meet the [ADA]'s definition of disability, and we suppose that defendant companies will often not contest the issue." (citation and quotation marks omitted)); 49 C.F.R. § 391.43(f) ("Monocular drivers are not qualified to operate commercial motor vehicles in interstate commerce.").

he was otherwise qualified for the job.

As the Ninth Circuit has cautioned,

"Essential functions" are not to be confused with "qualification standards," which an employer may establish for a certain position. Whereas "essential functions" are basic "duties," 29 C.F.R. § 1630.2(n)(1), "qualification standards" are "personal and professional attributes" that may include "physical, medical [and] safety" requirements. Id. § 1630.2(q). The difference is crucial.

The statute does not require that a person meet each of an employer's established "qualification standards," however, to show that he is "qualified." And, indeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge.

Bates v. United Parcel Serv., Inc., 511 F.3d 974, 990 (9th Cir. 2007) (*en banc*). The pertinent question, then, is whether Toole can establish that he can perform the basic duties of the job he was offered. See id. at 992 ("UPS argues that 'hearing' at a level sufficient to pass the DOT hearing standard is either a stand-alone essential job function or part and parcel of being a safe driver. This point illustrates the critical difference between a job's essential functions—'effective communication' or 'safe driving'—versus a qualification standard based on 'personal or professional attributes,' such as hearing at a certain level. The question, then, is whether plaintiffs established that they meet the essential function of safe driving.").

Regarding what constitutes an "essential function" under the ADA, Samson held:

"Essential functions" are "the fundamental job duties of the employment position," but do "not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

. . . Whether a particular job function is essential is "evaluated on a case-by-case basis by examining a number of factors." D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1230 (11th Cir. 2005) (internal quotation marks and citation omitted); see also McMillan v. City of New York, 711 F.3d 120, 126 (2d Cir. 2013) ("[A] court must conduct 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.' ") (citation omitted); Keith v. Cnty. of Oakland, 703 F.3d 918, 926 (6th Cir. 2013) ("Whether a job function is

essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment.") (citation omitted). Among the relevant factors is "[t]he employer's judgment as to which functions are essential." 29 C.F.R. § 1630.2(n)(3)(i). Although the employer's judgment is "entitled to substantial weight in the calculus," this factor alone is not conclusive. Holly[ v. Clairson Indus., LLC], 492 F.3d [1247,] 1285[ (11th Cir. 2007)] (internal quotation marks and citation omitted). Because if it were conclusive:

> then an employer that did not wish to be *inconvenienced* by making a reasonable accommodation could, simply by asserting that the function is "essential," avoid the clear congressional mandate that employers "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an *undue hardship* on the operation of the business of such covered entity."

Id. (citing 42 U.S.C. § 12112(b)(5)(A)) (alteration in original).

Other relevant factors include: any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience of employees in similar jobs. 29 C.F.R. § 1630.2(n)(3)(ii)-(vii). There are also three non-exclusive bases on which a particular job function may be deemed essential: (1) the position exists to perform that function; (2) a limited number of employees are available among whom that job function can be distributed; and (3) the job function is "highly specialized" so that the incumbent is hired for their expertise or ability to perform that function. Id. § 1630.2(n)(2).

2014 WL 1226847, at *3-4.

The judgment of Metal Services – which carries substantial weight – is that driving, on and off site, is an "essential function" of the Safety Trainer position. Specifically, Metal Services states that the "fundamental and essential job functions of the Safety Trainer" included "[d]riving CMVs [commercial motor vehicles] to teach drivers how they should be driven, driving employees off-site for drug screens or for medical treatment, driving to pick up or distribute personal protective

equipment, driving CMVs to or from repair shops, driving the Safety Truck, escorting vehicles inside the plant, driving around the plant to observe drivers to ensure they are driving their own vehicles safely, operating vehicles to resolve accident scenes or improve the safety of the plant site, and being prepared to take over the wheel of a CMV while on a road test with a driver trainee . . ." (Doc. 29 at 21). Metal Services also cites to the testimony and statements of Clyde Roberts, who was given a safety position soon after Toole was no longer being considered. (see Doc. 29 at 21-22). Such evidence implicates "the current work experience of employees in similar jobs" and "the amount of time spent on the job performing the function" factors set forth in 29 C.F.R. § 1630.2(n)(3)(iii) and (vii). Roberts asserts a number of duties requiring him to "drive commercial motor vehicles and/or non-commercial motor vehicles on-site and/or off-site" and that he did so 456 of the 616 days he has served as Safety Trainer between April 18, 2011, and January 7, 2014. (Doc. 32-4 at 1-2, ¶ 4 [Roberts Decl.]).

Toole has presented evidence indicating that there was no "written job description prepared before advertising or interviewing applicants for the [safety ]job[,]" or indeed any specific "Safety Trainer" position, at the time Toole applied for it. 29 C.F.R. § 1630.2(n)(3)(ii). Hamilton described the safety position as "new" at the time and admits that he did not have a definite set of duties and responsibilities for the position set out. However, he told Toole that he "needed someone to train and enforce policy, and the pre trip inspections, monitoring the drivers, eliminating the driver error on incidences and property damage[,]" as well as "an enforcer in order to enforce safety, training, pre truck checks, inspections, monitoring the drivers, teaching and training the drivers how to safely do things . . ." (Doc. 56 at 15, 44-45 [Hamilton Depo., pp. 56, 105-06]).

None of these duties plainly suggests that driving would be involved, much as Metal

Services would have the Court infer that.[11] Moreover, Toole has repeatedly expressed that he was not told that the safety position would entail driving duties, or at least those involving off-site driving.

Toole also relies on the fact that Preston Howard, Metal Services's only safety employee before Hamilton made the decision to start hiring more safety employees, did not possess a CDL or engage in any on-site driving. See (Doc. 56 at 60 [Hamilton Depo., p. 133]); 29 C.F.R. § 1630.2(n)(3)(vi) (work experience of past employees in the job). Toole also points out that after Toole's job offer was withdrawn, Metal Services hired, at various times, Matt McDaniel, Robert Garrett, and Duwayne Foster for the position of Safety Technician. These individuals were not required to pass a DOT physical or obtain CDLs. See (Doc. 32-3 [Hamilton Decl.]; Docs. 52-54); 29 C.F.R. § 1630.2(n)(3)(vii) (the current work experience of employees in similar jobs). Thus, a reasonable person could infer that driving was not an essential function of the safety position.

Upon consideration, the Court finds that Toole has presented sufficient evidence creating a genuine issue of material fact as to whether driving was an "essential function" of Toole's safety position. See Samson, 2014 WL 1226847, at *4-5 (reversing summary judgment because genuine factual dispute existed as to whether test-driving was an essential function of a technician position where the relevant factors were in conflict (citing Henschel v. Clare Cnty. Road Comm'n, 737 F.3d 1017, 1024 (6th Cir. 2013))). Thus, Toole has met his burden of showing a genuine issue of material fact as to whether he was a "qualified individual" for the safety position.[12]

---

[11] At summary judgment, all reasonable inferences are to be drawn in favor of the non-movant, and it is not unreasonable to infer that a safety trainer would not have to engage in driving in order to teach drivers.

[12] The Court also notes that even if driving were an essential function of the job, there is still a dispute as to what type of driving is essential and whether Toole would be qualified, even without a DOT medical card, to perform the job.

### 2.    Unlawful Discrimination Because of Disability

Metal Services asserts Toole cannot show that he was unlawfully discriminated against due to his disability because "he has not established that the decisionmaker, Art Hamilton[], knew that he had monocular vision when the job offer was withdrawn . . ." (Doc. 29 at 3. See also id. at 27 (Toole "has failed to establish that Hamilton had actual knowledge that he had monocular vision at the time he withdrew the offer.").  In support, Metal Services cites to Toole's testimony "that Hamilton told him that he could not hire him, because he failed the vision part of his exam[,]" to which Toole "said nothing in response and had no other conversations with any TKIPS employee about his medical exam or his job." (Doc. 29 at 28 (citing Doc. 31-2 at 33-36 [Toole Depo., pp. 175, 180-81, 191-92]).

"[I]t is evident that an employee cannot be fired 'because of' a disability unless the decisionmaker has *actual* knowledge of the disability[,]" as " '[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.' " Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1183, 1185 (11th Cir. 2005) (quoting Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1262 (11th Cir. 2001)).  Accord Howard v. Steris Corp., No. 12-14776, 2013 WL 6645411, at *2 (11th Cir. Dec. 18, 2013) (unpublished).  In addition, "[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." Morisky v. Broward Cnty., 80 F.3d 445, 448 (11th Cir. 1996) ("[Plaintiff] relies upon the information furnished, that she could not read and had taken special education courses, as sufficient to put Broward County on notice of her developmental disorder. While illiteracy is a serious problem, it does not always follow that someone who is illiterate is necessarily suffering from a physical or mental impairment.").

Toole points out that TKIPS received the IMC Medical Report on March 30, 2011, on page 10 of which Toole had marked "Yes" to having monocular vision (though on page 9, he marked

"No" to having "eye disorders or impaired vision (except corrective lenses)"). (Doc. 43 at 78-79). Toole also asserts that, other than the Medical Report, "there is no other evidence of record as to how Hamilton would have known of the vision exam failure[,]" again pointing out that this was Hamilton's stated reason for not hiring Toole. (Doc. 41 at 32). In reply, Metal Services argues that "Toole's IMC medical report was stamped received 'March 30, 2011' by an unidentified TKIPS employee" and that such receipt, standing alone, cannot impute actual knowledge of Toole's monocular vision to Hamilton, as "[t]here is no record evidence that Hamilton read the report, and there is no record evidence that Toole told Hamilton he had monocular vision." (Doc. 61 at 13). Metal Services also cites to Hamilton's testimony stating that, when he first learned Toole had not completed his physical, he was told that it was due to a blood pressure issue and that no mention was made "about one eye or vision or anything like that. (Doc. 30-1 at 31-32 [Hamilton Depo., pp. 140-41]).[13]

Drawing all reasonable inferences in favor of Toole, the Court concludes that he has presented sufficient evidence creating a genuine issue of material fact as to whether Hamilton knew of his monocular vision. A reasonable juror, presented with evidence that 1) TKIPS received the Medical Report indicating that Toole had monocular vision, 2) that Hamilton was indisputably awaiting the results of Toole's physical before making a hiring decision, and 3) that Hamilton said Toole failed the vision test, could reach the conclusion that Hamilton learned of Toole's disability

---

[13] Metal Services has also argued that Toole cannot establish a *prima facie* case because he cannot show "that *but for* his disability, he would have been hired." (Doc. 29 at 24). Regardless of the applicability of "but for" analysis to ADA claims, such analysis is applied at the pretext stage rather than the *prima facie* case stage of the McDonnell Douglas framework. See Sims v. MVM, Inc., 704 F.3d 1327, 1334 (11th Cir. 2013) ("Assuming *arguendo,* as the district court did, that Sims has established a prima facie case of age discrimination in a[reduction in force ("RIF")] claim, Sims cannot sustain his burden of proving that Perkins' age discrimination was the 'but-for' cause of his inclusion in the RIF. MVM clearly articulates legitimate, non-discriminatory reasons for Sims' inclusion in the RIF—namely, that budget constraints forced it to eliminate two supervisor positions.").

prior to deciding not to hire him for the safety position. Unlike the employers in the cases to which Metal Services cites, there is evidence contradicting Hamilton's statement of lack of knowledge. Cf. Cordoba, 419 F.3d at 1174 ("As operations manager, Groo had very little contact with Cordoba and averred that she 'had absolutely no inkling ... Cordoba had any health problems.' Cordoba produced no evidence that directly contradicted Groo's testimony . . . We agreed with the district court that 'an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability,' and that Cordoba had failed to show that Groo, the relevant corporate decisionmaker, was aware of her alleged disability."); Silvera, 244 F.3d at 1261-62 ("There was a conflict in the evidence about whether Silvera told Wright about his prior arrests during his 1982 job interview. Silvera indicated that he did, Wright's sworn statement insisted that he did not. For purposes of deciding whether the Board was entitled to judgment as a matter of law, the district court quite properly resolved that conflict in the evidence in favor of Silvera and took it as fact that Wright knew about those two arrests. But the court went beyond that by imputing Wright's knowledge to the Board and reasoning that if the Board constructively knew of Silvera's lewd assault arrest when it hired him in 1982, the Board's stated reason that it fired Silvera in 1996 for that same arrest must have been pretextual, or at least a jury could so find. []We disagree. To begin with, there is no evidence at all that Wright actually told the Board anything about Silvera's arrest. His sworn statement indicated that he did not. The district court overcame that obstacle to a judgment for Silvera by simply imputing the knowledge Wright had to the Board. Doing that was error, because it equates constructive knowledge with actual intent."); Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 794, 800 (11th Cir. 2000) ("Nelson testified in his deposition that when he decided to terminate Brungart, he had no knowledge of her scheduled FMLA leave, and there is no evidence to contradict his testimony about that . . . Because the evidence is unrefuted that Nelson, the decision maker, did not know Brungart had requested and

19

been scheduled for medical leave, Brungart failed to create a genuine issue of fact as to a causal connection between her termination and her scheduled leave or her request for it.").

### b. Improper Medical Examination (Count II)

The A[DA] also restricts an employer's ability to make medical examinations or inquiries that relate to an applicant's disability status. <u>See</u> § 12112(d). Subsection 12112(d)(1) states the general bar against using medical examinations or inquiries to discriminate. Subsections (d)(2) through (d)(4) provide further guidance regarding three distinct phases of the application process: (1) pre-offer, <u>see</u> § 12112(d)(2); (2) post-offer but pre-employment, <u>see</u> § 12112(d)(3); and (3) employment, <u>see</u> § 12112(d)(4).

<u>Harrison v. Benchmark Elecs. Huntsville, Inc.</u>, 593 F.3d 1206, 1212 (11th Cir. 2010).

Metal Services argues that § 12112(d)(3) – covering the "post-offer but pre-employment" application phase, <u>see</u> <u>Harrison</u>, 593 F.3d at 1212 – applies to Toole's "improper medical inquiry" claim asserted in Count II. (see Doc. 29 at 18, § IV.A.) Section 12112(d)(3) provides:

A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if--

**(A)** all entering employees are subjected to such an examination regardless of disability;

**(B)** information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that--

    **(i)** supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

    **(ii)** first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

    **(iii)** government officials investigating compliance with this chapter shall be provided relevant information on request; and

**(C)** the results of such examination are used only in accordance with this subchapter.[14]

Metal Services asserts "[i]t is undisputed . . . that TKIPS hired [Toole] prior to sending him to IMC for his DOT physical" and "that TKIPS required all entering employees to undergo a DOT physical at the time he was hired, and has always required employees with driving duties to undergo a DOT physical." (Doc. 29 at 18). Accordingly, Metal Services argues, "[b]ecause TKIPS required Toole to undergo the same DOT physical it required all of its employees to undergo at the post-offer, pre-employment stage, it did not violate the ADA and Count II is due to be dismissed." (Id. at 18-19).

In support of its argument that Toole should be treated a "post-offer but pre-employment" applicant subject to § 12112(d)(3), Metal Services notes Toole agreed at deposition that Hamilton "told [him he] was hired pending the physical" and that he was "even given new-hire paperwork to fill out." (Doc. 31-2 at 26, pp. 141, 144). On March 24, 2011, Toole filled out and turned in to TKIPS an I-9 "Employment Eligibility Verification" Form, an Internal Revenue Service W-4 Form, an Alabama Department of Revenue A-4 "Employee's Withholding Exemption Certificate," direct deposit authorization forms, an "Affirmative Action & Vet's 100 Employment Survey," and insurance benefit documents. (Id. at 27-28 [pp. 145-150], 64-74 [Exs. 15-20]). That same day, Toole also signed a form entitled "Non-Disclosure/Non-Competition and Invention Assignment Agreement," which stated in the first paragraph: "I am being offered and I am accepting employment with ThyssenKrupp InPlant Services, LLC . . ." (Id. at 27 [p. 145], 59-63 (Ex. 14)).

---

[14]  Unlike § 12112(d)(2), see Harrison v. Benchmark Electronics Huntsville, Inc., 593 F.3d 1206 (11th Cir. 2010), and § 12112(d)(4), see Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1310 (11th Cir. 2013), cert. denied, 134 S. Ct. 655 (2013), the Eleventh Circuit has not issued any controlling precedent regarding § 12112(d)(3), see Bennett v. Dominguez, 196 F. App'x 785, 793 (11th Cir. 2006).
  In addition, the Eleventh Circuit has recognized that a plaintiff has a private right of action under 42 U.S.C. § 12112(d)(2), see Harrison, 593 F.3d at 1214, and § 12112(d)(4), see Owusu-Ansah, 715 F.3d at 1311, irrespective of his disability status. The Court finds no reason to believe this reasoning should not apply to § 12112(d)(3), and no party has advanced such an argument.

After turning in the filled-out paperwork to a secretary, Toole was given forms for his Industrial Medical Center physical. (Id. at 28 [pp. 150-51], 75-76 [Ex. 22][15]).

In response to this argument, Toole asserts that it is § 12112(d)(2) – covering the "pre-offer" application phase, see Harrison, 593 F.3d at 1212 – that applies to Toole's "improper medical inquiry" claim.[16] (see Doc. 41 at 21).

> In the pre-offer stage, . . . "a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability." § 12112(d)(2)(A). An employer may only inquire into the "ability of an applicant to perform *job-related functions.*" § 12112(d)(2)(B) (emphasis added).

Harrison, 593 F.3d at 1212. However, this assertion is not supported by sufficient evidence and is clearly contradicted by Toole's deposition testimony. Accordingly, the Court finds that the standard to be applied is the post-offer standard.

But even with a finding, as a matter of law, that Toole was a "post-offer but pre-employment" applicant under § 12112(d)(3), Metal Services has failed to demonstrate that it is due summary judgment as to this claim. Specifically, Metal Services has failed to demonstrate that there is no genuine issue of material fact that "the results of such examination are used only in accordance with" the ADA subchapter governing employment, as required by § 12112(d)(3)(C). As set forth *supra*, there is a genuine issue of material fact regarding whether Metal Services's requirement of the DOT medical examination is an impermissible "qualification standard" that "tend[s] to screen out an individual with a disability or a class of individuals with disabilities . . ." See Samson, 2014 WL 1226847, at *6. Such use would therefore not be "in accordance with" §

---

[15] On the IMC Consent Form that he was given, Toole signed the date "2/24/11" next to his signature on the first page, but "3/24/11" on the second page. (Doc. 31-2 at 75-76 (Ex. 22)). Toole admitted at deposition that the "2/24/11" date on the first page was a mistake. (Doc. 31-2 at 29 [pp. 153-54]).

[16] This position is consistent with Toole's allegation in Count II of his Amended Complaint that he was "a pre-offer applicant" when he was "subjected to an improper medical inquiry/exam." (Doc. 7 at 5, ¶ 24).

12112.

###    c.    Legitimate, Non-Discriminatory Reason

Once [Toole] put[s] forth a prima facie case, which establishes a presumption of discrimination, the burden then shift[s] to [Metal Services] to articulate a legitimate, non-discriminatory reason for [withdrawing his job offer]. [Metal Services] simply ha[s] the burden of production, and d[oes] not need to persuade the court that it was motivated by the reason. After the articulated reason [is] given, the inferential presumption of discrimination [is] eliminated, the McDonnell Douglas framework disappear[s], and [Toole i]s left with the ultimate burden of proving that [Metal Services] intentionally discriminated against h[im] because of h[is] disability. In order to prove this intentional discrimination, [Toole i]s allowed to show [Metal Services]'s reason [i]s "unworthy of credence" and a pretext for discrimination.

Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (citations omitted).

Metal Services argues that it "has articulated legitimate, non-discriminatory reasons for the withdrawal of [Toole's] job offer, namely (1) he failed the vision portion of his DOT physical, and (2) he did not complete the actual physical portion of that exam."  (Doc. 29 at 29).

However, as Toole correctly points out, these are arguably not "non-discriminatory" reasons.  Under the ADA, " 'discrimination against a qualified individual on the basis of disability' includes . . . using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity . . ."  42 U.S.C. § 12112(b)(6).

Metal Services's requirement of the DOT medical examination is a  "qualification standard" that "tend[s] to screen out an individual with a disability or a class of individuals with disabilities . . ." See Samson, 2014 WL 1226847, at *6.  Moreover, Metal Services' reasons clearly show that "but

23

for" Toole's failure to complete and pass the exam, he would have been hired. Thus, Metal Services's reasons constitute impermissible discrimination unless Metal Services meets is burden to show that the requirement to complete and pass the DOT physical exam was job related and consistent with business necessity.

### d. Business Necessity Affirmative Defense

The ADA "prohibit[s] an employer from applying a qualification standard that screens out or tends to screen out disabled persons." Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1316 (11th Cir. 2009) (*per curiam*) (citing 42 U.S.C. § 12112(b)(6)). However, the ADA "also afford[s] an employer an affirmative business-necessity defense to claims challenging the application of an otherwise problematic standard." Id. (citing 42 U.S.C. § 12113(a)). Section 12113(a) states: "It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter."

This defense also applies to claims of improper medical examination or inquiry. See Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306 (11th Cir. 2013), cert. denied, 134 S. Ct. 655 (2013); 29 C.F.R. § 1630.14(b) ("A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant and before the applicant begins his or her employment duties, and may condition an offer of employment on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such an examination (and/or inquiry) regardless of disability . . . [I]f certain criteria are used to screen out an employee or employees with disabilities as a result of such an examination or inquiry, the exclusionary criteria must be job-related and consistent with business necessity, and

performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part.").  "To benefit from the affirmative defense, an employer must prove that the pertinent qualification standard is job-related and consistent with business necessity . . . [T]his burden is generally quite high . . ."[17]  Id. at 1316-17.  "Once an employer demonstrates that the pertinent qualification standard is job-related and consistent with business necessity, the burden shifts to the plaintiff to offer a reasonable accommodation that would allow him to satisfy that standard."  Id. at 1317.

The Eleventh Circuit has noted:

> Some courts treat the[] terms[ job-relateness and business necessity] as synonymous, but they are actually distinct pillars of the affirmative defense. As this Court has explained, "[j]ob[-]relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer in making hiring or promotional decisions." Hamer, 872 F.2d at 1533. Business necessity, in contrast, "is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria in hiring or promotional decision making." Id.

Id.  Accord Owusu-Ansah, 715 F.3d at 1311.

The crux of Metal Services's argument in this regard is that the DOT medical exam, particularly the vision test, is an acceptable and reasonable gauge of an employee's ability to drive safely and operate large equipment in general.  See, e.g., Doc. 29 at 22 ("A DOT physical is a fitting test for safety sensitive jobs that involve driving, because it tests specific conditions related to safe driving.")).

"Measures demonstrably necessary to meeting the goal of ensuring worker safety are []deemed to be 'required by business necessity' under Title VII."  Fitzpatrick v. City of Atlanta, 2

---

[17] This burden "is significantly lowered when . . . 'the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great ....' "  Allmond, 558 F.3d at 1317 (quoting Hamer v. City of Atlanta, 872 F.2d 1521, 1535 (11th Cir. 1989) (internal quotation marks omitted)).  However, Metal Services does not advance such an argument.

F.3d 1112, 1119 (11th Cir. 1993); Allmond, 558 F.3d at 1317 n.6 ("In defining the scope of the affirmative business-necessity defense under the Rehabilitation Act and the ADA, we look to cases analyzing the defense under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*"). See also Bates, 511 F.3d at 998 ("To be sure, DOT's regulation does not apply to the category of vehicles at issue in this case. However, that circumstance does not mean that the standard has no relevance to the employer's safety argument. UPS is entitled to use as some evidence of its business necessity defense the fact that it relied on a government safety standard, even where the standard is not applicable to the category of conduct at issue . . . Thus, while certainly not dispositive of UPS's showing of job-relatedness, business necessity or the reasonableness of potential accommodations, UPS's reliance on the government safety standard with respect to other vehicles in its fleet should be entitled to some consideration as a safety benchmark.").

Upon consideration of the evidence as outlined *supra*, the Court finds that there are issues of material fact to be resolved as to whether Metal Services has demonstrated having Toole complete a DOT medical examination is both "job-related and consistent with business necessity" to ensure the safety of both Toole and others.

Moreover, the Court finds that Toole has presented sufficient evidence of a reasonable accommodation; specifically, that had he been allowed to take a standard non-DOT medical examination, he would not have been automatically disqualified on the basis of his monocular vision. (See Doc. 46 at 19-20 [Dr. McDowell Depo., pp. 83-84[18]]). A "reasonable accommodation"

---

[18] Specifically, Dr. McDowell testified:

Q:    . . . If this wasn't a DOT physical would [Toole] have been able to complete it?
A:    Well, if it wasn't a DOT physical there wouldn't be a number seven because we don't use that form. We would use our form. And in that case, no, I would not have stopped other than for the blood pressure. I would have stopped the physical and put him on hold because of his blood pressure . . .
Q:    But that's just for the blood pressure at that point?
A:    The blood pressure.

may include "appropriate adjustment or modifications of examinations." 42 U.S.C. § 12111(9)(B). See also 29 C.F.R. § 1630.2(o)(1)(i) ("The term reasonable accommodation means . . . [m]odifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires . . ."). The undisputed evidence indicates that the only reason Toole failed his DOT medical exam was because of the automatic disqualification of monocular drivers. The Court cannot make the assumption that all monocular drivers pose a safety risk while driving all types of vehicles. Moreover, the record is unclear whether Toole's blood pressure alone would have prevented him from completing an examination. Metal Services has presented no argument or evidence that the standard non-DOT medical examination would not have served as a sufficient gauge of Toole's ability to drive safely.[19]

### e. Motion to Strike

Contemporaneous with his Response to the motion for summary judgment, Toole filed a motion to strike (Doc. 58) certain expert testimony submitted as evidence by Metal Services.[20]

---

Q:    The monocular vision wouldn't have stopped you in that case?
A:    Probably not. Although, my -- again, fit for duty for specific type jobs.
Q:    I mean, you would have noted "he can only see in one eye, he's eligible to do jobs" --
A:    That don't require depth perception, yes, unless proven he can do it.

[19]    There is also an issue as to whether Toole is required to prove that he requested this specific accommodation. Toole has not alleged a violation of 42 U.S.C. 12112(b)(A) which would require Toole to establish that he requested the accommodation and that it was reasonable. This issue has not been briefed to allow the Court to make a determination. **The parties are directed to address this issue in their pre-trial document submission.**

[20]

> [I]n the aftermath of the substantive 2010 amendments to Rule 56, it appears that motions to strike summary judgment exhibits are no longer appropriate. As revised, Rule 56 provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Advisory Committee's note specifies further that such an objection "functions much as an objection at trial, adjusted for the pretrial setting" and that "*[t]here is no need to make a separate motion to strike.*" Id. advisory committee's note (emphasis added).[FN5]

Upon consideration, the motion to strike (Doc. 58) is **DENIED**.[21]

## V.    Conclusion[22]

In accordance with the foregoing analysis, it is **ORDERED** that Metal Services's Motion for Summary Judgment (Doc. 28) is **DENIED** and that Toole's Motion to Strike (Doc. 58) is **DENIED**.[23]

**DONE** and **ORDERED** this the **2nd** day of **May 2014.**

/s/ Kristi K. DuBose_
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

FN5 – The Court acknowledges that, as to the propriety of motions to strike evidence submitted in support of or in opposition to a motion for summary judgment, Alabama and federal procedures differ. Quite recently, the Alabama Supreme Court reaffirmed its adoption of the old federal practice that a party must move to strike an affidavit that violates Rule 56 lest his objection be considered waived. See Ex parte Secretary of Veterans Affairs, ⸺ So.3d ⸺, No. 1101171, 2012 WL 415479, at *5 (Ala. Feb. 10, 2012) (citing Perry v. Mobile Cnty., 533 So.2d 602 (Ala. 1988)). However, as three dissenting justices recognized, the federal summary judgment rule no longer reads as it did a quarter-century ago, and it is now clear that, in federal court, "a motion to strike is not desired." Id. at *12 n. 8 (Murdock, J., dissenting).

N. Assur. Co. of Am. v. C & G Boat Works, Inc., Civ. A. No 11-00283-KD-N, 2012 WL 1712594, at *5 & n.5 (S.D. Ala. May 15, 2012) (DuBose, J.).

[21] To the extent Toole moves to exclude the expert testimony at trial, such a request should be made in a timely filed pre-trial motion in limine/Daubert motion.

[22] The practice of filing motions to reconsider has become commonplace. Considering the heightened burden that must be met for the Court to reconsider, the Court has found most such motions to be a waste of the Court's and the parties' resources.

[23] Toole's second motion to supplement his response (Doc. 66) is **DENIED as moot**.